VERNE MONTANICK, by his next Friend, JOHN MONTANICK, Appellee, v. FRED McMILLIN, Appellant.

No. 44247.

444

REHEARING DENIED SEPTEMBER 30, 1938.

McNett, Kuhns & Brown, for appellant.

McElderry & Lawrence and Jones & White, for appellee.

MITCHELL, J.—The accident involved in this case occurred at about 3:25 p. m. on November 21, 1935, within the city limits of Ottumwa, on the south approach to the Vine Street bridge crossing the Des Moines river, at a place where a driveway, leading from a rock quarry, enters the approach.

Vine Street runs in a northeasterly and southwesterly direction, but in the record is usually indicated as north and south, and that is the way we will refer to it. Where it crosses the Des Moines river there is a bridge that has a roadway for two-way traffic but is hardly wide enough for three cars to pass at the same time. Along the east side is a sidewalk, about five feet wide, provided for pedestrians. The girders are on the west of the walk and on the east it is protected by a metal fence or guard rail. Extending south from the bridge for a considerable distance (approximately several blocks) is a dirt-fill, which is used as the south approach. It has a fence or guard rail on either side. The road for vehicular travel is an extension of the roadway of the bridge. On the east side of the fill there is a sidewalk, which extends south from the sidewalk of the bridge. The roadway where the vehicles travel on the approach is seventeen feet in width and the sidewalk to the east of it is five feet in width. Commencing at a point 77 feet south of the south end of the bridge proper, on the east side, there is an opening which extends about eighteen and a half feet north and south, to give access to a driveway leading east from the approach to what is designated

as the rock quarry. The quarry driveway as it extends east from the opening is filled ground and not surfaced, and the traveled portion of it is sixteen feet and six inches from shoulder to shoulder. Leaving the approach of the bridge, going east, the quarry driveway slopes downward. This road is used as an access to the rock quarry which has for some time been operated by Wapello County to secure materials used in building and repairing highways. On the day of the accident a truck, owned by Wapello County and driven and operated by Fred McMillin, was returning to the quarry to secure another load of crushed rock after having delivered one to the place where the highway improvements were being made.

Verne Montanick, who was sixteen years of age, and a student at the Ottumwa High School, was returning to his home on the south side of the Des Moines river, the high school being on the north side. He was riding a bicycle which he had for some time used in going back and forth from home to school. He was accompanied by William Dungan, a boy of about the same age, also a student at the high school, who too was riding a bicycle. As they crossed the bridge these two boys were riding on the sidewalk provided for pedestrians, on the east side of the Vine Street bridge, Verne being ahead of his companion about fifteen or twenty feet. ''They were traveling about as fast as a boy could run,'' is the way they described it. There is, of course, a dispute in the testimony, which we will later go into in detail. According to the boys' story, as they crossed the bridge and approached the south end thereof, they noticed a dump-truck traveling west, coming out of the quarry to the approach of the bridge. At that time Verne was just leaving the bridge, which was about 77 feet north of the opening to the quarry road. He slowed down so that the truck could pass out of the quarry driveway onto the approach.

Fred McMillin was driving a truck belonging to Wapello County. It was a Ford V-8, 1½-ton, 1933 model, with a long wheel base. It had a home-made bed, with a bottom drop, and was capable of hauling about four yards of rock at a time. The length of the box was nine feet, four inches. The sides were made of two-inch boards, set with 4 x 4 braces. The bed was attached to the chassis of the truck by clamps. There was a cab, the back of which was about four inches in front of the bed. The cab was enclosed and protected like any truck. There was

a window in the back, which was stationary, and there were windows at the sides. There was a door on either side. McMillin was driving south on the west side of the bridge, and, he testified, before he turned the truck he opened the door on the left-hand side and looked back. However, there is evidence from which the jury could find that this was some ways back on the bridge, for McMillin testified that he did not see the boy. In addition to this, the negligence alleged was the failure to maintain a proper lookout at the time he drove across the sidewalk, where this accident happened. Had McMillin looked to the left at that point he was bound to have seen the boy, but according to his testimony, he never did see the boy. When he drove into the opening of the quarry road he noticed quite a bump, which he said he thought was unusual, stopped the truck, got out, and found that he had run over Verne Montanick. He immediately took the boy to the hospital, where it was ascertained that Verne was very severely injured, having several fractures. He was confined to the hospital for a period of weeks.

As a result of the accident this lawsuit occurred. It was brought by Verne Montanick by his next friend, John Montanick, his father, against Fred McMillin, the driver of the truck, and Wapello County, seeking damages in the amount of $27,075. There was a trial to the jury. Before the case was submitted plaintiff dismissed the cause of action as against Wapello County. The jury returned a verdict of $5,000 against Fred McMillin. Being dissatisfied, he has appealed.

I. The first question that confronts us here is appellant's contention that the lower court erred in not sustaining the motion to direct a verdict, because "the evidence showed that Verne Montanick was guilty of negligence which contributed to the accident and the injuries sustained by him."

It is the contention of appellant that there is little dispute in the evidence. True, there is not the dispute in this case we usually find in automobile cases. However, in regard to how the accident really happened there is a sharp conflict between the parties and the witnesses. It is the appellant's claim that when he drove across the Vine Street bridge, into the entrance of the driveway to the rock quarry, he made a sharp turn and that that put his truck in front of the boy as he came along on the bicycle. The peculiar thing about this theory is that if he, McMillin, made that sharp turn and drove directly into the

entrance he should have been able to see the boy as he rode along the sidewalk. It must be kept in mind that the boy had a perfect right to ride upon the sidewalk; and that appellant knew he was going to cross a sidewalk used by pedestrians and others; and that he did not see the boys on their bicycles. It is the contention of the appellee, and there is evidence to bear it out, that appellant curved into the opening to the approach to the quarry, and that by so doing he drove up behind Verne Montanick rather than in front of him. The boys both testified they did not see the truck until Verne's bicycle was practically up against the truck. He was riding slowly, grabbed the box of the truck and hung on for some little distance, finally losing his hold and falling under the rear wheel.

Appellant places great reliance upon the fact that the boys testified there was a sharp, cold wind blowing from the southwest and that Verne, in order to keep his ears warm, put his hand to the side of his head. He would have you understand the evidence shows the boy was covering his eyes. We do not so read it. In fact, Verne testified that he changed hands, putting his hand over his right ear at one time and then shifting to the other hand and putting it over the other ear. Clearly, there is a dispute in the record in regard to this, and it was for the jury to pass upon.

In the case of Perkins v. Schmit & Co., 215 Iowa 350, at page 353, 245 N. W. 343, at page 345, this court said:

"Under the assumption aforesaid, it now becomes necessary to determine whether Milford Perkins at the time in question was guilty of contributory negligence. Generally speaking, contributory negligence is peculiarly a question for the jury, rather than for the court to decide. Murphy v. Iowa Electric Company, 206 Iowa 567, 220 N. W. 360, and cases therein cited."

We read, in the case of Holderman v. Witmer, 166 Iowa 406, at page 410, 147 N. W. 926, at page 928:

"It is urged by the appellee that the plaintiff failed to prove want of contributory negligence. This question was not considered by the trial court. If the point were well taken, however, it would furnish a sufficient reason for refusing a new trial and affirming the case. We are satisfied, however, that the point is not well taken. * * * The fact that the automobile came

from behind, that it was turning in from Locust street, that it was widening the zone of danger by moving diagonally southeast, are all circumstances favorable to the decedent on the question of contributory negligence. It is sufficient to say briefly that, the evidence being sufficient to go to the jury on the question of Larson's negligence, and no conclusive contributory negligence being disclosed, the case was clearly for the jury."

This court, in the case of Smith v. Spirek, 196 Iowa 1328, 195 N. W. 736, 737, said:

"The controlling question in the determination of the instant appeal involves the doctrine of contributory negligence. The decisive fact questions relate to the credibility of two sharply defined and diametrically opposed versions of the circumstances and occurrences of the accident giving rise to the claimed damages."

In the very recent case of Huffman v. King, 222 Iowa 150, 268 N. W. 144, we find the following at page 154, 268 N. W., at page 147:

"It is the well settled rule of law in this state that if there is any evidence tending to establish plaintiff's freedom from contributory negligence, that question is one for the jury. Allender v. Railroad Co., 37 Iowa 264; Fitter v. Telephone Co., 143 Iowa 689, 121 N. W. 48; Holderman v. Witmer, 166 Iowa 406, 147 N. W. 926; Nelson v. Hedin, 184 Iowa 657, 169 N. W. 37; Barnes v. Barnett, 184 Iowa 936, 169 N. W. 365; McSpadden v. Axmear, 191 Iowa 547, 181 N. W. 4; Read v. Reppert, 194 Iowa 620, 190 N. W. 32; Carlson v. Meusberger, 200 Iowa 65, 204 N. W. 432; McWilliams v. Beck, 220 Iowa 906, 262 N. W. 781; Enfield v. Butler, 221 Iowa 615, 264 N. W. 546; Roberts v. Hennessey, 191 Iowa 86, 181 N. W. 798."

Verne Montanick was on the sidewalk, in a place of comparative safety. He was proceeding at a slow rate of speed, looking ahead. He saw the truck that came out of the driveway from the quarry. He and his companion both testified that they did not see the truck driven by appellant until it cut in behind them. Appellant, the driver of the truck, did not see the boys and yet he says he was watching. Clearly, in view of such a record the question of whether the boy was guilty of contribu-

tory negligence was for the jury. The jury had an opportunity to observe the witnesses on the stand, and, after being fully instructed by the court, found the appellee was not guilty of contributory negligence.

II. It is claimed the court erred in not withdrawing from the jury the specification of negligence charged in the petition that McMillin did not keep a proper lookout.

Again we must call attention to the difference in the theories of how this accident happened. It is appellant's theory that he made a square turn and that he was across the sidewalk before Verne Montanick ran into him, whereas it is the appellee's theory that he reached the crossing first and that McMillin's truck came from behind him. There is the evidence of these two boys, who are the only eye witnesses to just what happened, altho there was one witness, who was down near the quarry, some distance away, who claimed to have seen part of the accident. Both of the boys testified that the truck came up from behind them. If it did, then, clearly, McMillin did not maintain the proper lookout, for he himself testified that he did not see the boys. He must have come from behind the boys unless he made an absolutely square turn when he headed into the approach to the quarry. He was on the opposite or west side of the approach, and it was necessary for him to cross to the east side to reach the road to the quarry. He did not stop before he started to cross. It is true, he testified that he looked back along the bridge to see if anyone was coming behind him, and that he opened the door to show he was going to make a turn. He sounded no horn, and his own testimony shows that he did not see the boys. Clearly, the question of whether he maintained a proper lookout was one for the jury to pass upon.

III. It is next claimed by the appellant the court erred in permitting counsel for appellee to ask the sixteen jurors then in the box on voir dire examination whether they or any of their family were stockholders, officers or employees of a certain insurance company, and again asking the same question of Mrs. Anna Bissell, subsequently called for examination.

It must first be noted that the objection was made to the question, but there was no motion made to discharge the jury and for a new trial.

This question has been before us on many recent occasions.

In the case of Raines v. Wilson, 213 Iowa 1251, 239 N. W. 36, this court said at page 1262, 239 N. W., at page 40:

"The question which we are now considering has been passed upon by numerous courts, including our own. The overwhelming majority of the courts sustain the right of counsel for the plaintiff, in a personal injury case, so long as he acts in good faith for the purpose of obtaining information upon which to exercise his peremptory challenges *of the jurors,* and not for the purpose of informing the jury that an insurance company is back of the defendant of record, to interrogate prospective jurors by one form or another of questions, with respect to their interest in, or connection with, insurance companies. See 56 A. L. R., pages 1456, 1457, 1458. Twenty-seven of our sister states have passed upon the question and sustained the plaintiff's right to propound an inquiry such as was the one propounded in the instant case. See Note in 56 A. L. R., pages 1456-1458, and cases there cited. It is clearly apparent that, if a litigant were denied the right to propound the question asked the jurors in the instant case, he might be compelled to accept a juror who is a stockholder in an insurance company, and probably the very one having defendant's liability insured. In the instant case, plaintiff's counsel who propounded the interrogatory was a nonresident of the county in which the case was tried. There is nothing unusual for jurors to own stock in corporations. Appellee in his written argument brings us the information that the Financial World of March 25,1931, shows that of the families in the United States 27.2% thereof own stock in corporations. There was nothing odious in the general question propounded. We think it was a proper question to be asked, for the purpose of informing counsel relative to his right in exercising peremptory challenges, and, as held by our prior cases hereinbefore cited, that there was no abuse of discretion on the part of the trial court. There is nothing in the record to show want of good faith on the part of plaintiff's counsel; nothing to show a willful, diligent or persistent course or effort to impress upon the jury the fact that defendant's liability was insured."

In Olson v. Tyner, 219 Iowa 251, at page 255, 257 N. W. 538, at page 540, we read:

"Appellants' counsel desired to have the question con-

tinued over until all of the prospective jurors had been questioned. Counsel for appellee, however, asked all of the sixteen jurors whether or not they were interested in any liability insurance company, and asked that if anyone was interested he should hold up his hand. No hands were raised. The selection of the jury then proceeded, and, after five peremptory challenges had been exhausted, three on the part of the appellee and two on the part of the appellants, the counsel for appellee proceeded to examine the additional six called to the box as to whether they were connected with any liability insurance company.''

And at page 256 of 219 Iowa, page 540 of 257 N. W.:

''Attorneys for the appellee had a right to ascertain whether or not any of the prospective jurors were interested in liability insurance companies. The necessity of this is proven in this case by the fact that the agent of the company that carried the liability insurance the appellant Thomas Tyner had on his car was one of the prospective jurors called. The manner in which the attorneys for the appellee handled this matter seems to us to show that they had no desire to inject the question of insurance into this case, but they had a desire, and rightly so, to determine whether or not any of the prospective jurors were interested in liability insurance companies, and, as it happened, the very agent of the insurance company that wrote the liability policy was one of the prospective jurors. We believe that the lower court was right in overruling the motion to discharge the jury and continue the case.''

There is no evidence in this record that counsel for appellee was guilty of any persistence in bringing up the matter of insurance. Wapello County, where the case was brought, is a comparatively small county, with the greater proportion of its population living in Ottumwa, a city of some thirty thousand residents. In such a city attorneys do not know the occupation of the prospective jurors, and naturally they desire to ascertain same before selecting them for jury service.

IV. We come now to the difficult question involved in this case, and in the solution of same we have been greatly assisted by the able briefs filed by the friends of the court on both sides.

In this case the court had more friends than in any case that has been submitted in years.

It must be conceded that this case is on all fours with the case of Hibbs v. Independent School District, 218 Iowa 841, 251 N. W. 606, and that, unless this court, as it is now composed, is in favor of overruling that case, the lower court erred in not sustaining the motion for a directed verdict on this ground alone.

■ Liability of Fred McMillin is not predicated upon any relationship growing out of his employment, but is based upon the fundamental and underlying law of torts, that he who does injury to the person or property of another is civilly liable in damages for the injuries inflicted.

■ Every case which allows recovery against a servant can be based upon the fundamental proposition that that servant violated or breached some duty that he owed to the person injured. It may be an act of misfeasance, nonfeasance or malfeasance. An example of the dilemma in which the courts finally arrive in their effort to apply the rule, is shown in the case of Southern Railroad Company v. Grizzle, 124 Ga. 735, 53 S. E. 244, 110 Am. St. Rep. 191. Here a railroad engineer was held personally liable for one injured at a highway crossing by his failure to give the required signals, and when it was argued that the failure to give the required signal was an act of nonfeasance the court said:

"The engineer having once undertaken in behalf of the principal to run the train, it was incumbent upon him to run it in the manner prescribed by law; and a failure to comply with the law, although it involved an act of omission, was not an act of mere nonfeasance, but was an act of misfeasance." 53 S. E., at pages 245, 246.

How much better it would have been in the above-cited case merely to have stated that the failure to blow the whistle was a breach of a duty owed to the injured person and consequently the engineer, who was guilty of this breach of duty, was liable.

There is a very interesting and able discussion by Justice Faville in the case of Emery v. American Refrigerator Transit Co., 193 Iowa 93, 184 N. W. 750, 20 A. L. R. 86.

Here an action was brought against a refrigerator company to recover damages claimed to have been suffered by the plain-

tiff because of the negligent and careless manner in which the refrigerator company performed its work of loading and icing cars. The carrier was not sued, and the refrigerator company was under a contract with the carrier to load and ice the cars. The action was in tort, and there was no contention that there was any privity of contract between the plaintiff, shipper, and the defendant refrigerator company. Many cases are reviewed in that opinion, which held that an action against the refrigerator company could be maintained. The court quotes extensively from a number of cases, including Delaney v. Rochereau, 34 La. Ann., 1123, 44 Am. Rep. 456:

"Everyone, whether he is principal or agent, is responsible directly to persons injured by his own negligence in fulfilling obligations resting upon him in his individual character and which the law imposes upon him, independent of contract. No man increases or diminishes his obligations to strangers by becoming an agent. If, in the course of his agency, he comes in contact with the person or property of a stranger, he is liable for any injury he may do to either, by his negligence, in respect to duties imposed by law upon him in common with all other men." Page 104 of 193 Iowa, page 754 of 184 N. W.

The court finally held:

"We therefore hold that for misfeasance in the performance of its contract with its principal, which misfeasance caused injury to appellee's property, the latter had a right to action in tort against appellant." Page 105 of 193 Iowa, page 754 of 184 N. W.

The doctrine of *respondeat superior*, literally, "let the principal answer," is an extension of the fundamental principle of torts, and an added remedy to the injured party, under which a party injured by some act of misfeasance may hold both the servant and the master. The exemption of governmental bodies and their officers from liability under the doctrine of *respondeat superior*, is a limitation or exception to the rule of *respondeat superior*, and in no way affects the fundamental principle of torts that one who wrongfully inflicts injury upon another is liable to the injured person for damages.

In the case at bar we are confronted with an act of misfeasance on the part of an employee of a county.

454

In the case of Hibbs v. Independent School District, 218 Iowa 841, 251 N. W. 606, this court made no distinction between acts of misfeasance and acts of nonfeasance. However, it is interesting to note that the cases cited and relied upon in the Hibbs case are all cases of nonfeasance and there is not a single case cited that holds the agent or employee is not liable for an act of misfeasance. It is a well-established rule in this state that counties are not liable for torts growing out of the negligent acts of their agents or employees. Hilgers v. Woodbury County, 200 Iowa 1318, 206 N. W. 660. Nowhere, except in the Hibbs case, do we find that the agent or employee himself, when sued as an individual, rather than in his official capacity, is not liable for acts of misfeasance, that is, a positive negligent act which caused injury and damage to another.

In Iowa there is an exceptionally good statement of the law in the case of Rowley v. Cedar Rapids, 203 Iowa 1245, 212 N. W. 158, 53 A. L. R. 375. Here the City Commissioner was looking after business of the city, and the plaintiff was struck by an automobile alleged to have been operated under the personal direction of the defendant commissioner. Both the city and the defendant commissioner filed demurrers to the petition. The trial court sustained both demurrers. On appeal the ruling of the trial court sustaining the demurrer as to the city was sustained, but the ruling sustaining the demurrer as to the defendant commissioner was reversed. In that case the court said at page 1250, 212 N. W., at page 160:

"If it should be conceded, as the demurrer assumed, that Kennedy was engaged in the performance of a governmental duty in proceeding from one point to another on the city's business, still we think the demurrer on his behalf was improperly sustained.

"We have held, it is true, that an agent who performs a governmental function on behalf of a county is no more responsible for negligence in so doing than the corporation for which he acts. Snethen v. Harrison County, 172 Iowa 81, 152 N. W. 12; Gibson v. Sioux County, 183 Iowa 1006, 168 N. W. 80. In these cases, negligence was charged on the part of the members of the board of supervisors in respect to permitting various defective conditions to exist in a public highway. In great measure, the acts charged as negligence were acts of non-

feasance, and they all related to alleged negligence in respect to the condition of the highway and the things done or omitted in preparing it for use. In Wood v. Boone County, 153 Iowa 92, 133 N. W. 377, 39 L. R. A. (N. S.) 168, Ann. Cas. 1913D, 1070, where it was said that it would be an anomalous doctrine that would exempt a corporation itself from liability for the doing of a lawful act in a negligent manner, on the ground of its compulsory agency in behalf of the public welfare, and at the same time affix liability upon the agent for precisely the same act, done under express authority, the act complained of was one of nonfeasance,—the failure to furnish relief to a pauper. We recognize *arguendo* that, if the agent undertook to furnish relief, he might be personally liable for a negligent performance, although the county would not. We think that these cases and the doctrine there announced have no application to the facts pleaded here. Aside from the distinction between a county and a city, which would perhaps not be controlling where the officer of a city was engaged in the performance of a governmental duty, there is a well recognized distinction between acts of nonfeasance and those of misfeasance, and also, we think, so far as the personal liability of the agent is concerned, between an act of negligence which is committed while the agent or officer is engaged in the performance of an official duty, but which is otherwise unrelated to such duty, and the negligent performance of the duty itself. Could it be said that a member of the board of supervisors, when traveling in performance of his official duty to repair a highway, could escape personal liability for an injury negligently inflicted upon one whom he met on the way, because of the official character of his errand, although he would not be liable for a negligent performance of his mission to repair the highway? In Goold v. Saunders, 196 Iowa 380, 194 N. W. 227 we said:

" 'A public official may be guilty of negligence in the performance of official duties for which his official character gives him no immunity.' "

Public service should not be a shield to protect a public servant from the consequences of his personal misconduct.

The New Jersey court in the case of Florio v. Mayor and Aldermen of Jersey City, 101 N. J. L. 535, 129 Atl. 470, at page 471, 40 A. L. R. 1353, at page 1356, said:

"But it would be a travesty upon both law and justice to hold, that, because of the gravity and importance of the duties cast upon him, he has become clothed with the privilege, while in the act of performing such duties, to thrust aside all ordinary prudence in driving along the public streets to the great hazard of life and limb of men, women, and children of all classes and conditions, who may be upon the public highway. He must answer for his negligence, though in the performance of a public duty, in the same manner as if he were an individual in private life and had committed a wrong to the injury of another. The servant of the municipality is required to perform his duty in a proper and careful manner, and when he negligently fails to do so, and in the performance of his duty negligently injures another, his official cloak cannot properly be permitted to shield him against answering for his wrongful act to him who has suffered injury thereby."

The Connecticut court in Voltz v. Orange Volunteer Fire Association, Inc., 118 Conn. 307, 172 Atl. 220, 222, said:

"This claim involves a misconception of the doctrine of governmental immunity, which does not extend to the protection of the employee of the municipality from the consequences of his own negligence. The driver of a fire truck is liable to one injured by his negligent driving, though the municipality employing him is exempt from liability. Florio v. Jersey City, 101 N. J. L. 535, 129 A. 470, and cases cited in the annotation to that case in 40 A. L. R. 1358."

Very recently the Court of Appeals of the City of New York had occasion to consider this question in Ottmann v. Incorporated Village, 275 N. Y. 270, 9 N. E. 2d 862, 863, 864, where it was held:

"Sound public policy requires that one injured by the negligent act of another engaged in a public service should be permitted to recover the damages suffered as a result of such misconduct. Public service should not be a shield to protect a public servant from the result of his personal misconduct. How inequitable the contrary rule would be is illustrated by the case at bar. Although the jury has found that intestate met his death as a result of the negligence of the respondent driver of the fire truck, the municipality is not liable and we so decided.

If it be held that the driver is also free from liability, there would be no liability on the part of any one for the negligent act which caused decedent's death. We believe the law to be that a servant, agent or officer of a municipality is required to do his work in a reasonably careful manner and that if he fails to do so and another is injured because of his negligence he is personally responsible, the same as any other person who has by his misconduct caused injury.''

It is interesting to note that the New York court in that decision quoted from this court's opinion in the case of Rowley v. Cedar Rapids, 203 Iowa 1245, 212 N. W. 158, 53 A. L. R. 375.

In the case of Moynihan v. Todd, 188 Mass. 301, 74 N. E. 367, 108 Am. St. Rep. 473, in a well-considered opinion in which authorities are extensively reviewed, the supreme court of Massachusetts said the principle underlying the rule that exempts public officers from liability for negligence in the performance of public duties goes no further than to relieve them from liability for nonfeasance and for the misfeasance of their servants or agents, but that:

''For a personal act of misfeasance, we are of opinion that a party should be held liable to one injured by it, as well when in the performance of a public duty as when otherwise engaged.'' 188 Mass. 301, 74 N. E., page 369, 108 Am. St. Rep., page 477.

The California court in Perkins v. Blauth, 163 Cal. 782, 127 Pac. 50, while recognizing that municipal corporations are not liable for dereliction or remissness of municipal officers or agents in the performance of public or governmental functions of the city, said that the agent would be responsible for his tortious acts, although the municipality would not.

In Manwaring v. Geisler, 191 Ky. 532, 230 S. W. 918, 18 A. L. R. 192, where a police officer on a motor cycle struck and injured a child, that court said:

''Nor is a peace officer exonerated from liability for an injury inflicted while in the discharge of official duties on another on the ground of public necessity if the officer failed to exercise reasonable care for the protection of those whom he knew or by the exercise of reasonable judgment should have expected to

458

be at the place of the injury, although he may not be criminally liable.'' 191 Ky. 532, 230 S. W., page 920, 18 A. L. R., page 194.

There is a well marked distinction between an act of an employee, agent or officer of the state or arm thereof, which is done as an act *per se* governmental in its nature and an act which, tho performed by the agent or officer while he is engaged in a public duty, is nevertheless unrelated to the performance of the duty in any other way. An employee of the county may, for instance, during the hours of darkness step into the driver's seat of an automobile, and without turning on the lights and on the wrong side of the street, with the lights at an intersection set against him, at an excessive speed, collide with a pedestrian lawfully crossing at the intersection. The fact that the negligent person is a governmental employee should certainly not exonerate him from the consequences of his negligence.

The distinction between acts of nonfeasance and misfeasance has been pointed out by this court. In the recent case of Smith v. Iowa City, 213 Iowa 391, at page 395, 239 N. W. 29, at page 31, this court said:

''It is a general rule that the neglect of a public officer to perform a public duty will constitute an individual wrong only when the person complaining is able to show that the act of the officer involved a duty owing to him as an individual, and that by the failure of the officer to perform his duty, the complainant has suffered a special and peculiar injury. The negligence, if any, of the individual members of the park board was the failure on their part to maintain the device or instrumentality in question in repair and in a safe condition for the use of the public; that is, they are guilty, if at all, of nonfeasance only. The distinction between acts constituting nonfeasance and acts constituting misfeasance is well pointed out in Rowley v. City of Cedar Rapids, supra.''

An act of misfeasance is a positive wrong, and every employee, whether employed by a private person or a municipal corporation, owes a duty not to injure another by a negligent act of commission. It is the breach of this duty which the law imposes on all men that is involved, and this general obligation to injure no man by an act of misfeasance is neither increased nor diminished by the fact that the negligent party is an employee of a municipal corporation.

The laws of the state and nation must keep pace with conditions that exist. Where a rule has its origin in the decisions of courts it may be changed by the courts in the light of experience unless it has become fixed by constitutional or legislative provision. If the old rule is found to be unsuited to present conditions, or is unsound, it should be set aside and a rule declared which is in harmony with these conditions and meets the demands of changes. That the common law has within itself the quality and capacity for growth and of adaptation to new conditions, has been one of its most admirable features. The law has the inherent capacity to meet the requirements of the new and various experiences which arise out of the development of the country.

■ Upon the question of the duty of courts to correct their own decisions when they are found to be wrong, no matter how long those decisions have stood and notwithstanding there has been no legislative change in the law as originally construed, we have the authority of the Supreme Court of the United States in an opinion handed down on April 25th of this very year, in the case of Erie Railroad Company v. Harry J. Tompkins, 304 U. S. 64, 58 S. Ct. 817, 82 L. Ed. 1188.

In that opinion the Supreme Court of the United States overruled the case of Swift v. Tyson, 16 Peters 1, 10 L. Ed. 865, decided in 1842, which has been supported by such recent cases as Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co., 276 U. S. 518, 48 S. Ct. 404, 72 L. Ed. 681, 57 A. L. R. 426. The rule in that case could have been changed by legislative enactment. In fact, many bills were introduced to change it, but Congress failed to act, and the Supreme Court of the United States, believing the decision wrong, by a 6 to 2 opinion, reversed the holding of that same court more than one hundred years before and followed continuously to the present time.

■ And so this court, as now composed, after careful consideration, has come to the conclusion that the rule announced in Hibbs v. Independent School District is wrong, and the opinion in that case is overruled; that an employee of a city, county or state who commits a wrongful or tortious act, violates a duty which he owed to the one who is injured, and is personally liable.

460

It necessarily follows that this case must be, and it is hereby, affirmed.—Affirmed.

STIGER, C. J., and RICHARDS, DONEGAN, MILLER, and SAGER, JJ., concur.

ANDERSON, J., dissents.