Donald H. GASPER and Katherine Gasper, As Guardians Ad Litem of Todd J. Gasper, A Minor, Plaintiffs and Appellants,

v.

Douglas FREIDEL, Todd Meyer, William Carda, Tom Svatos, Jane Drapeaux, Sherry Soulek, Harold Ingalls, Alvin Archambeau, Beverly Steinmark, and Larry Johnson, Defendants and Appellees.

No. 16540.

Supreme Court of South Dakota.

Considered on Briefs Oct. 19, 1989.

Decided Jan. 3, 1990.

Wally Eklund of Johnson, Eklund & Davis, Gregory, for plaintiffs and appellants.

Gerald Reade and Celia Miner of Brady, Reade & Johnson, Yankton, for defendants and appellees.

MORGAN, Justice.

Todd J. Gasper (Gasper) appeals orders granting summary judgment in favor of Superintendent William Carda (Carda), Lake Andes School Board members Tom Svatos, Jane Drapeaux, Sherry Soulek, Harold Ingalls, Alvin Archambeau, Beverly Stein, Mark and Larry Johnson (collectively referred to as Board unless noted otherwise) and coaches Douglas Freidel (Freidel) and Todd Meyer (Meyer). We affirm.

On June 26, 1985, Gasper, a minor, was participating in a summer conditioning program which consisted of weight training under the supervision of two high school coaches, Freidel and Meyer. Gasper had been active in athletics and intended to participate in football during the fall of his junior year. The conditioning program was held in the wrestling room of the Lake Andes Central School (Andes Central).

Freidel and Meyer were coaches and teachers in the Lake Andes School District. Both were fully certified as teachers and athletic coaches by the State of South Dakota and under contract to the school district for 1985–86 school year. Though regular school activities had ceased prior to June 26, 1985, Freidel's and Meyer's contracts contained the following clause: "It is hereby agreed that the said teacher may be required to perform pre-school term and post-school term duties as set forth in the policies of the school district." Both Freidel and Meyer were paid on a twelve-month basis, even though the regular school term is only about nine months.

Freidel was the head football coach and Meyer served as his assistant. As a part of the general preparation for the football program, Freidel had started a summer weight lifting and conditioning program in 1984 for any current or prior students of Andes Central. Meyer was assisting Freidel with the program during the summer of 1985. The purpose of the program was to offer an opportunity for students to generally improve their physical condition and confidence. The affidavit of Marlyn Goldhammer, Executive Secretary of the South Dakota High School Activities Association (SDHSAA), established that the Andes Central conditioning program complied with all SDHSAA out-of-season conditioning rules. Additionally, the uncontroverted affidavit of Max Hawk, an expert in physical education, established that the weight-lifting facility maintained by Andes Central was a reasonable and proper facility for the weight lifting and conditioning program. All equipment required only minimal supervision by the coaches. The equipment, weights, and mats provided were proper and appropriate.

In the spring of 1984, Freidel had asked Carda if a summer weight-conditioning program could be run at Andes Central. Carda authorized the program. Previously, Board had delegated all executive and supervisory authority to its employees and, in particular, delegated the direct authority to administer the school system to Carda. Carda knew that Freidel had training and experience with weight lifting. Board was fully aware that the conditioning program was taking place during the summers on Andes Central property.

In preparation for the weight-lifting activity Freidel, assisted by two athletic coaches, held an in-depth clinic for the students. During this session, the students were shown how to safely use the weight-lifting equipment and trained in the necessity of using spotters when free weights were being used. Gasper attended the clinic. He had been trained to properly warm up, to lift correctly, and to use spotters whenever he was using the squat rack. The squat rack is a heavy metal stand that supports a bar, collars, and free weights. A lifter moves under the bar and supports the bar and weights upon his shoulders before stepping outside the support of the squat rack. Once the lifter steps back from the squat rack, he is supporting a considerable amount of weight with his legs, back, and shoulders; thus the need for spotters.

On the morning of June 26, 1985, Freidel opened the weight-lifting room about 11:00 A.M. Art Westendorf (Westendorf), a student, was waiting to work out. Shortly after 11:00 A.M., Meyer stopped in. A second student, Jamie Boetel (Boetel), then arrived and also began working out. Gasper arrived at the weight room about noon and began exercising at the bench press. Just prior to the accident, the three boys were all working out—Westendorf doing side lifts, Boetel at the squat rack, and Gasper at the bench press.

Freidel and Meyer were seated on two rolled-up wrestling mats in the vicinity of the squat rack, talking to each other. Whenever Boetel requested, Westendorf and Freidel would spot for Boetel as he did sets with the heavy weights. Boetel completed his workout in the squat rack and left 335 pounds of weight on the bar. As Boetel left the squat rack, Gasper came under the bar and into the rack. Boetel told Gasper to wait while Boetel found him a weight-lifting belt that fit properly. Gasper did not wait. Instead, without requesting any assistance, he moved into the rack, lifting the 335 pounds upon his shoulders. Gasper admitted that he had not warmed up properly and knew he was to have spotters when lifting this amount of weight. Without spotters to stop him, Gasper lost

his balance and stepped backwards out of the rack, falling to the floor in a jackknife position with the weights on his shoulders. When asked why he tried to lift 335 pounds without spotters and proper warm-up, Gasper replied, "Because I could do it."

Gasper's parents, as guardian ad litem, filed suit against Carda, Board, Freidel, and Meyer, alleging that defendants' permitted an unauthorized and unlawful conditioning program without proper supervision on Andes Central facilities which proximately caused the injury to Gasper. The trial court granted motions of summary judgment in favor of all defendants on the grounds of sovereign immunity.

Gasper raises one issue on appeal: Whether sovereign immunity applies to shield the school superintendent, the school board members and the teacher/coaches from liability when a student is injured in a summer weight-conditioning program?

■ The standard of review of the grant or denial of summary judgment is well established.

In reviewing a grant or a denial of summary judgment under SDCL 15–6–56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. *Groseth Intern., Inc. v. Tenneco, Inc.*, 410 N.W.2d 159, 164 (S.D.1987). The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. *Wilson v. Great Northern Ry. Co.*, 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968). The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. *Ruane v. Murray*, 380 N.W.2d 362, 364 (S.D.1986). Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper. *Weatherwax v. Hiland Potato Chip Co.*, 372 N.W.2d 118,

120 (S.D.1985); *Ruple v. Weinaug,* 328 N.W.2d 857, 859–60 (S.D.1983).

*Pickering v. Pickering,* 434 N.W.2d 758, 760–61 (S.D.1989). Summary judgment is usually not appropriate in negligence actions because the standard of a reasonable man must be applied to conflicting testimony. *Laber v. Koch,* 383 N.W.2d 490 (S.D. 1986). If, however, the facts are undisputed, the issue becomes one of law for this court to consider. *Bego v. Gordon,* 407 N.W.2d 801 (S.D.1987).

Gasper contends that coaches Freidel and Meyer are not shielded by sovereign immunity because the summer conditioning program was not a school activity and they were not working under their teaching contracts; therefore, they were outside their scope of employment and not protected. Additionally, Gasper argues that Carda and Board are not shielded by sovereign immunity because there was no official approval by the school for the use of the facilities; therefore, they, too, are not protected. We disagree as to all defendants and believe that summary judgment was appropriate. For clarity's sake, we will examine sovereign immunity as it applies to each type of defendant.

### SCHOOL BOARD MEMBERS

In *Bego,* this court summarized the law on school board immunity as follows:

> School districts are state agencies exercising and wielding a distributive portion of the sovereign power of the state, and the officers of school districts are the living agencies through whom the sovereign state act is carried into effect. A school district officer in the performance of his duties acts in a political capacity as much so as the governor of a state and is not liable for negligent acts of omission occurring in the performance of such political or public duties unless the sovereign power of the state has authorized and consented to a suit for such negligence.

407 N.W.2d at 804 (quoting *Merrill v. Birhanzel,* 310 N.W.2d 522 (S.D.1981), and *Plumbing Supply Co. v. Board of Education,* 32 S.D. 270, 272–73, 142 N.W. 1131, 1132 (1913).

At the time of this accident, there was no legislative consent to expose school districts to tort liability.* *Holland v. Yankton School Dist. 63–3,* 375 N.W.2d 199 (S.D.1985). Put succinctly, school board members were immune from suit, either as board members or individuals, if they did not act in excess of their lawful authority or commit intentional torts. *Bego, supra.* Using this standard, we examine the acts of Board.

Every member of Board was duly elected for the Lake Andes Central School District at the time of the injury to Gasper. Thus, they are "school district officers" entitled to the shield of sovereign immunity if authorizing the summer conditioning program was a lawful act and they committed no intentional tort to take them outside their scope of employment. *Merrill, supra; Bego, supra.*

First, Board acted within its lawful authority in authorizing the summer conditioning program. Under SDCL 13–8–39, Board had the right to direct and manage school programs and property, including the wrestling room at Andes Central. Further, it had the authority to offer educational opportunities and services for all citizens residing within the school district. SDCL 13–8–1.

■ Second, pursuant to Board's policy and procedural manual, it retained full legislative and judicial authority over the schools, but delegated all executive, supervisory, and instructional authority to its employees. Superintendent Carda was delegated the direct authority to administer the school system. In executing Board policy to make maximum use of school facilities, Carda made a decision to authorize a summer weight-lifting program conducted by Freidel and Meyer. Board was aware

---

* We note that Gasper's injury occurred before the passage of SDCL 21–32A–1 through 21–32A–3, which provided a scheme for school districts and their officers, agents, and employees to waive sovereign immunity under the rubric of "public entities" if liability insurance had been purchased. Later our opinion deals with whether these statutes should be applied retroactively.

of this program. Though Board could have taken formal action to acknowledge the program, none was required since it had delegated the executive and supervisory authority to Carda. Having delegated the authority to execute and administer the policy, Board had no remaining duty to authorize or to supervise the weight-lifting program.

Third, the summer conditioning authorized by Carda was lawful. The affidavit of Marlyn Goldhammer, Executive Secretary of the South Dakota High School Activities Association (SDHSAA), established that the Andes Central conditioning program complied with the SDHSAA out-of-season rules. These SDHSAA rules were set out in Board's athletic policy. Contrary to Gasper's assertion, this is no factual basis to claim the program was in violation of South Dakota law.

Fourth, Board committed no intentional torts that would take their acts outside the scope of employment. Having properly delegated the authority to supervise school activities to Carda, Board had no further duty to supervise the weight-lifting program. Carda selected fully trained teachers to run the program. It is uncontested that the facilities and equipment were proper and appropriate. Gasper's complaint alleges that Board permitted a program without proper supervision or facilities. Even viewing his complaint in the most favorable light, this alleges nothing more than a negligent omission that would not take Board outside the scope of employment. We do not find that the trial court erred in granting summary judgment in favor of Board.

## SUPERINTENDENT CARDA

Once again in *Bego*, this court summarized the state of the law as concerns school district employees.

> We find that the state's sovereign immunity does not extend to a state employee unless (1) the action is really one against the state and the employee is sued in his representative capacity only or (2) the employee is engaged in the performance of a discretionary function.

407 N.W.2d at 805. Carda does not contend he falls within the first exception. He does, however, claim sovereign immunity under the discretionary function test.

In *National Bank of South Dakota v. Leir*, 325 N.W.2d 845, 848 (S.D.1982), we looked to the test established in the Restatement (Second) of Torts § 895(d) Comment f (1979), to determine what is a discretionary function.

> (1) The nature and importance of the function that the officer is performing....
>
> (2) The extent to which passing judgment on the exercise of discretion by the officer will amount necessarily to passing judgment by the court on the conduct of a coordinate branch of government....
>
> (3) The extent to which the imposition of liability would impair the free exercise of his discretion by the officer....
>
> (4) The extent to which the ultimate financial responsibility will fall on the officer ...
>
> (5) The likelihood that harm will result to members of the public if the action is taken....
>
> (6) The nature and seriousness of the type of harm that may be produced....
>
> (7) The availability to the injured party of other remedies and other forms of relief.

Using those criteria, Carda's actions were discretionary. Carda was performing the important function of administering the school system on behalf of Board. In exercising his discretion, he sought to carry out Board's desire to have school facilities fully used by authorizing a summer conditioning program. As part of that responsibility, he secured two fully licensed and certified coaches, Meyer and Freidel, to supervise the conditioning program. For the court to second guess his judgment and that of Board in delegating to him this responsibility would be passing judgment on a coordinate branch of government. If we were to interfere in this type of judgment, it would severely hamper school administrators. Carda had no information that he

had secured coaches who were not competent to supervise or that there was a problem in supervising the weight-lifting program. This is the type of decision that normally will not be harmful to the public. Finally, Gasper would always have a cause of action if the coaches' conduct was outside their scope of employment or nondiscretionary acts of commission. Considering all of these factors, the trial court did not err in finding that Carda was protected by sovereign immunity and granting summary judgment.

## COACHES FREIDEL AND MEYER

There are three questions that must be answered with respect to Freidel and Meyer's actions: (1) Were they acting within the scope of their employment? (2) Were they grossly negligent in causing the injury to Gasper? (3) Were they performing a discretionary function? *Bego, supra.*

■ Gasper argues that summary judgment was inappropriate on scope of employment because whether one is acting as an agent for another is a fact to be determined by a jury. *Zee v. Assam,* 336 N.W.2d 162 (S.D.1983). This general proposition is true only if the facts are disputed. If they are not, the matter is a question of law for this court. *Bego, supra.*

Here, Freidel and Meyer were conducting a program as part of their twelve-month contractual duties that called for pre-school term duties. The program was approved by Carda and met all rules of the SDHSAA for an out-of-season conditioning program. There is no disputed question of fact whether Freidel and Meyer were acting as agents of the school district.

Though Gasper's pleadings allege that Freidel and Meyer failed to provide adequate or proper instruction, supervision, safety devices and facilities and "permitted Gasper to attempt to lift without the aid of spotters or other safety devices," these allegations do not amount to intentional torts that would carry Freidel and Meyer outside their scope of employment. *Bego, supra.*

Gasper's own testimony established that there were no material issues of fact on every point except adequate supervision. He admitted that he had been properly instructed in using a weight belt when lifting and had done so on 25 previous occasions prior to the accident. He also admitted being instructed by Freidel on the need to always use spotters. Despite this, he lifted without spotters though Freidel and Meyer were close enough they could have been asked to perform this function. Gasper is bounded by his own statements of the facts and cannot make a stronger case than that which is established by his testimony. *Ford v. Robinson,* 76 S.D. 457, 80 N.W.2d 471 (1957). Additionally, expert witness Max Hawk provided uncontroverted evidence that the Andes Central weight lifting facilities, squat racks, and safety equipment were proper and appropriate.

■ Thus, the only factual allegation that remains contested is that Freidel and Meyer failed to provide adequate and proper supervision. Even assuming this to be true, this is an act of omission, not an intentional tort.

Freidel had given Gasper a thorough class on the proper use of the weights and safety equipment. Taking Gasper's fact under the best light, they allege nothing more than omissions on Freidel's and Meyer's part. The key to understanding this concept is the difference between "misfeasance" and "non-feasance"—that is to say, between active misconduct working positive injury to others and passive inaction or failure to take steps. South Dakota has traditionally recognized this distinction in acts of commission and omission. *Erickson v. Lavielle,* 368 N.W.2d 624 (S.D.1985); *Blumhardt v. Hartung,* 283 N.W.2d 229 (S.D.1979). Here, there was no active misconduct that produced the injuries. As such, there was no gross negligence to take Freidel and Meyer outside their scope of employment.

■ Finally, we must determine whether Freidel's and Meyer's actions were ministerial or discretionary. Since the facts are not in dispute as to their actions, we must determine as a question of law whether their function was discretionary and thus shielded them from liability under sover-

eign immunity. *National Bank,* 325 N.W.2d at 850.

Once again we look to the discretionary action test in *National Bank, supra.* Freidel and Meyer were carrying out the important function of conditioning student/athletes for all sports. For this court to second guess Freidel's and Meyer's judgment on how to supervise and train athletes would infringe on the executive branch of government. Most importantly, imposition of liability would impair the free exercise of discretion. No person will want to be a coach if his or her judgment in supervising athletic training is continually open to lawsuits. In all sporting events, there is the potential for injury, especially in the contact sports. No matter how well a coach trains an athlete, there are always unexpected events which may produce an injury. This court does not want to position itself to continually decide whether the string of athletic injuries that occur every year are the result of coaching negligence. And, while we realize that there is some harm done to the public, student athletes who go out for sports know there are attendant dangers. Injury is one of those risks and athletes accept that as part of the price of participating in sporting events.

Further, we would point out that Freidel's and Meyer's actions are distinguishable from what we have defined as ministerial acts in *National Bank, supra; Kruger v. Wilson,* 325 N.W.2d 851 (S.D.1982); and *Sioux Falls Construction Co. v. City of Sioux Falls,* 297 N.W.2d 454 (S.D.1980).

In *National Bank,* two social workers were held personally liable for their negligent placement and supervision of children in foster care. The criteria for placement and standards for follow-up of foster children were already established. The social workers were merely required to carry out the standards. That differs radically from our facts here. Freidel designed the summer conditioning program and he and Meyer personally implemented and supervised the program. It was their decision on how to implement their standards.

*Kruger, supra,* also differs from our facts here. In that case, a state employee on state business in a state car struck another car. This court deemed the following factors as determinative of ministerial actions: (1) unimportance of the function, driving a car; (2) imposing liability would not effect job discretion; (3) likelihood of harm depended on defendant, not on department authorizing trip; and (4) imposing liability would make defendant more careful and not impact employer. We have previously discussed the importance of Freidel's and Meyer's jobs and the effect on their discretion. What we find critical is the impact liability will have on the school districts. If, by way of just one example, a coach can be held personally liable because a player is told to leap high for passes and is hit in mid-air and injured, we believe school districts will find it nearly impossible to hire people to coach athletic programs.

Finally, *Sioux Falls Construction* is distinguishable from our facts as well. In that case, the water department superintendent failed to warn a contractor of impending flood run off or take actions to divert run off that damaged the contractor's equipment. This court put importance on the fact that the superintendent was not required to weigh policies for or against his action. Here, coaches Freidel and Meyer weighed the policy of how to best supervise and train people for the conditioning program. Freidel chose the option of one intensive class that taught techniques and safety. The program he developed allowed other students to act as spotters and required minimal on-hands supervision by the coaches. This court will not be one to second guess this discretionary policy decision.

Realizing the inherent dangers in athletics and other school activities that require discretionary decisions on supervision, two of our sister states have held teachers failing to act in similar situations were performing discretionary acts protected by sovereign immunity. *Truelove v. Wilson,* 159 Ga.App. 906, 285 S.E.2d 556 (1981) (unsupervised student killed when soccer goal fell on her); *Barr v. Bernhard,* 562 S.W.2d 844 (Tex.1978) (unsupervised stu-

dent injured when calf kicked beam and knocked down building on him).

We agree with the reasoning in these opinions and hold that the trial court did not err in granting summary judgment in favor of Freidel and Meyer.

District, as an alternative theory of sovereign immunity protection, argues that SDCL 21–32–17 protects Board, Carda, Freidel and Meyer as long as they were acting within the scope of their employment, regardless of whether their actions were ministerial or discretionary. Gasper argues this statute is unconstitutional. Since we have ruled on other grounds that the trial court properly granted summary judgment, we need not reach this question. *Sheehan v. United Pacific Ins. Co.,* 439 N.W.2d 117, 119 (S.D.1989) (court differs deciding constitutional question when the cause can be determined without reaching constitutional issue); *Baldwin v. First Nat. Bank of Black Hills,* 362 N.W.2d 85 (S.D.1985).

■ As an alternative position, Gasper contends that even if all defendants were acting in their official capacity as officers and employees of the Lake Andes School District, the subsequent passage in 1986 of SDCL 21–32A–1, 21–32A–2 and 21–32A–3 waived immunity, since the school district has purchased liability insurance. SDCL 21–32A–1 through SDCL 21–32A–3 was the legislature's response to our distinctions of when agencies were state agencies for the purpose of waiving sovereign immunity. These statutes used the term "public entities" to avoid this problem. They establish a scheme where public entities, which includes school districts and their employees, waive sovereign immunity to the extent of purchasing liability insurance. All the defendants contend that it would be improper to retroactively apply these statutes.

In *Arndt v. Hannum Trucking,* 324 N.W.2d 680 (S.D.1982), we made clear that "statutes are presumed to have prospective application and may be construed as retroactive only when such intention plainly appears." *Arndt* cited *State ex rel. Van Emmerik v. Janklow,* 304 N.W.2d 700 (S.D.1981) *appeal dismissed,* 454 U.S.

1131, 102 S.Ct. 986, 71 L.Ed.2d 285 (1982), as an example of the type of stated intention required for retroactive application. In *Van Emmerik,* a case involving utility sales tax, the legislation specially stated: "An act to provide for a retroactive and prospective sales tax increase on utility services, amusement and athletic events; to allow credit for taxes already paid, to validate and ratify the collection of prior taxes, and to declare an emergency." *Id.* at 702. The statute went on to give specific dates the legislation should be applied to. Absent similar language in SDCL 21–32A–1 through SDCL 21–32A–3, we find no legislative intent for retroactive application of the statute waiving sovereign immunity when liability insurance has been purchased.

■ Finally, Gasper makes a sweeping argument that sovereign immunity is unconstitutional and that in particular, the doctrine violates the "open courts" provision of our state constitution, article VI, § 20. In *High–Grade Oil Co. Inc. v. Sommer,* 295 N.W.2d 736 (S.D.1980), we answered Gasper's general constitutional objection to sovereign immunity:

To say that sovereign immunity is a constitutional violation is on its face an incongruity. In our republican form of government the people are the sovereign. The rights granted under the constitution are such rights as the sovereign grants. *Id.* at 739.

Gasper provides no argument, let alone proof beyond a reasonable doubt, why article III, § 27 violates the "open courts" provision, article VI, § 20 of our state constitution. "Under the common law, sovereign immunity only extended to the state and its agencies and subdivisions." *Oien v. City of Sioux Falls,* 393 N.W.2d 286, 290 (S.D.1986). As we noted earlier, school districts have always been considered state agencies. *Bego, supra; Holland, supra.* The "open courts" provision of our constitution is only violated if the cause of action against the school district, officers and employees would have existed at common law. *Oien, supra.* Since suits for discretionary actions did not exist at common law, Gas-

per has not met his burden of proving beyond a reasonable doubt that the concept of sovereign immunity embodied in article III, § 27 of our state constitution is unconstitutional.

Affirmed.

HENDERSON and MILLER, JJ., concur.

SABERS, J., concurs specially.

WUEST, C.J., deeming himself disqualified, did not participate in this opinion.

SABERS, Justice (specially concurring).

I commend the South Dakota Legislature for their special efforts in struggling to provide adequate remedies for persons wrongfully injured. SDCL 21–32–17 and SDCL 21–32A–2. I also commend the majority for its lucid opinion which brightens this otherwise complex and murky area of the law. I concur with the majority's holding that sovereign immunity shields the school board members, the superintendent, and the coaches from liability for tortious, *discretionary*[1] acts done within the scope of their employment. However, I must part company at the point where the legislative acts would attempt to extend sovereign immunity to shield any person who happens to work for the state from individual liability for all tortious acts done within the scope of their employment.

A person is individually liable to another for wrongful ministerial acts. That liability continues despite the fact that the same individual's liability for discretionary acts may be shielded by sovereign immunity.

In *Bego v. Gordon*, 407 N.W.2d 801, 805–806 (S.D.1987), we stated in part:

In *Oien v. City of Sioux Falls*, 393 N.W.2d 286 (S.D.1986), we considered the doctrine [of sovereign immunity] in conjunction with Article VI, § 20, the "open courts" provision of the South Dakota Constitution.[2] *Id.* at 290. In *Oien*, we interpreted the "open courts" provision as " 'a guarantee that "for such wrongs as are recognized by the law of the land the courts shall be open and afford a remedy." ' " *Id.*, quoting *Simons v. Kidd*, 73 S.D. 41, 46, 38 N.W.2d 883, 886 (1949). We wrote:

> That is to say, where a cause of action is implied or exists at common law without statutory abrogation, a plaintiff has a right to litigate and the courts will fashion a remedy.

*Id.*

The common law recognizes that merely being an agent or employee does not alter the duties otherwise owed to third parties. *See, e.g., Kelly v. State*, 265 Ark. 337, 578 S.W.2d 566 (1979); *Montanick v. McMillin*, 225 Iowa 442, 280 N.W. 608 (1938); *E.H. Emery & Co. v. American Refrigerator Transit Co.*, 193 Iowa 93, 184 N.W. 750 (1921); *Delaney v. Rochereau*, 34 La.Ann. 1123, 44 Am. Rep. 456 (1882). In *Kelly*, the court stated:

> Everyone, whether he is principal or agent, is responsible directly to persons injured by his own negligence in fulfilling obligations resting upon him in his individual character and which the law imposes upon him, independent of contract. No man increases or diminishes his obligations to strangers by becoming an agent. If, in the course of his agency, he comes in contact with the person or property of a stranger, he is liable for any injury he may do to either, by his negligence, in respect to duties imposed by law upon him in common with all other men.

---

**1.** Whether sovereign immunity shields an individual state employee from liability turns on whether the employee's acts are discretionary or ministerial. Numerous factors are to be weighed when deciding whether an act is discretionary or ministerial. *See, e.g., National Bank of South Dakota v. Leir*, 325 N.W.2d 845, 848 (S.D.1982). Generally, discretionary acts require the exercise of judgment, whereas ministerial acts involve the implementation of the judgment decisions of others.

**2.** S.D. Const. art. VI § 20 provides: "All courts shall be open, and every man for an injury done him in his property, person or reputation, shall have remedy by due course of law, and right and justice, administered without denial or delay."

578 S.W.2d at 567, *quoting Montanick* and *Delaney, supra.*

South Dakota has codified a similar statement of the law of negligence in SDCL 20-9-1 which provides in part, "[e]very person is responsible for injury to the person, property, or rights of another caused by his willful acts or caused by his want of ordinary care or skill[.]" The fact of agency does not change this rule. In *Kelly, supra,* the Supreme Court of Arkansas justified the imposition of personal liability upon a state official in light of the above quoted passage, despite recognition of the doctrine of sovereign immunity contained in the Arkansas Constitution. (footnote omitted). 578 S.W.2d at 567.

Although the state, as sovereign, is immune from suit in state courts without legislative consent, *Kruger v. Wilson,* 325 N.W.2d 851, 852 (S.D.1982), *citing* [*Conway v. Humbert,* 82 S.D. 317, 145 N.W.2d 524 (1966)], the liability of a state employee for his own negligent or intentional acts is another matter. "Every person is responsible for injury to the person, property, or rights of another caused by his willful acts or ... want of ordinary care[.]" SDCL 20-9-1. The remedy provided by common law and by this statute is supported not only by the "open courts" provision but by other substantial constitutional provisions.[3]

(Footnotes in original).

This court has consistently concluded that "the immunity available to the state does not extend to cover an employee conducting ministerial functions[.]" *Kruger, supra* at 854; *accord Leir, supra; Conway, supra; Walters v. City of Carthage,* 36 S.D. 11, 153 N.W. 881 (1915); *State v. Ruth,* 9 S.D. 84, 68 N.W. 189 (1896). In other words, ministerial conduct, if any, of Coaches Freidel and Meyer, whether omis-

sion or commission, is not shielded from individual liability by sovereign immunity even though within the scope of their employment.

A simple example illustrates this point:

1) A negligently drives his car into B causing injuries and damages. A is liable to B for the injuries and damages.

2) Same facts except that A happens to be going to pick up the mail for the state, county, city, or school board. A is individually liable to B for B's injuries and damages even though A is within the scope of employment.

Sovereign immunity does not extend to shield A from individual liability to B in the second situation. *See Kruger, supra.*

In *Baatz v. Arrow Bar,* 426 N.W.2d 298, 304 (S.D.1988), we stated:

SDCL 20-9-1 is a simple codification of the common law of negligence. In essence, then, the South Dakota Constitution and existing statutory law provide that an injured person has a right to a remedy against a wrongdoer. *Zacher v. Budd Co.,* 396 N.W.2d 122 (S.D.1986); *Oien v. City of Sioux Falls,* 393 N.W.2d 286 (S.D.1986); *Daugaard v. Baltic Coop Bldg. Supply Ass'n,* 349 N.W.2d 419 (S.D.1984). This is so whether the wrongdoer acts alone or with another wrongdoer. *Bego, supra.*

The legislature can impose reasonable restrictions upon available remedies and even upon these rights in accordance with the constitution, as long as they do not violate the constitution; but they cannot destroy these rights in violation of the constitution.

Even the provision of the constitution that provides for sovereign immunity im-

---

**3.** S.D. Const. art. VI provides in part:

§ 1. *Inherent rights.* All men have certain inherent rights including enjoying and defending life and liberty, acquiring and protecting property and the pursuit of happiness.

§ 2. *Due Process.* No person shall be deprived of life, liberty, or property without due process of law.

§ 12. *Privilege or immunity laws.* No law granting an irrevocable privilege, franchise or immunity shall be passed.

§ 18. *Equal privileges or immunities.* "No law shall be passed granting to any citizen, class of citizens or corporation, privileges or immunities which upon the same terms shall not equally belong to all citizens or corporations."

plicitly compels this result. Art. III, § 27 provides:

§ 27. *Suits Against the State.* The Legislature shall direct by law in what manner and in what courts suit may be brought against the state.

Although this provision of the constitution relates to procedure, not substance, it implies that substance should be provided or specified by the legislature. The remedy provided by the legislature must be reasonable, i.e., constitutionally sound. In other words, Article III, § 27 authorizes the legislature to specify when the state will waive its sovereign immunity, but the legislature may not expand the scope of that immunity. In *Oien, supra,* we held that the extension of sovereign immunity beyond traditional bounds was unconstitutional under the "open courts" provision of the South Dakota Constitution. *See* S.D. Const. art. VI, § 20.

Therefore, by attempting to extend sovereign immunity to shield ministerial acts as opposed to discretionary acts, the South Dakota Legislature overreached its bounds in enacting SDCL 21–32–17 and SDCL 21–32A–2. Likewise, the South Dakota Supreme Court erred when issuing its opinion for Governor Janklow by not limiting the sovereign immunity shield to liability for discretionary acts, as opposed to ministerial acts. *In re Request for Opinion of Supreme Court,* 379 N.W.2d 822 (S.D.1985). In fairness to the then existing members of the court, this exact point was not specifically raised or addressed in the opinion. Nevertheless, it reinforces the concerns expressed by Justice Henderson in his dissent about issuing advisory opinions and binding the court "in factual situations which have not been tried in a court of law," that is, where there is not a real case with a live controversy. *Id.* at 828.

4. If Gasper had requested their assistance and they either neglected or refused to assist, or if they had negligently caused weights to fall on him, their acts would be ministerial in nature and could subject them to individual liability. Obviously, any liability on their part under those circumstances would be subject to the defenses of contributory negligence and as-

In conclusion, I agree with the majority opinion that the acts of Coaches Freidel and Meyer, in designing and supervising the weight program, constitute discretionary acts as a matter of law and shield them from liability to Gasper.[4]

sumption of the risk, if any, on the part of Gasper. All of these questions would present genuine issues of material fact precluding summary judgment. *Bego, supra, Groseth Int'l, Inc. v. Tenneco, Inc.,* 410 N.W.2d 159 (S.D.1987); *Wilson v. Great Northern Ry. Co.,* 83 S.D. 207, 157 N.W.2d 19 (1968).