Timothy J. SANDER and Rebecca Lee Holloway, Co–Executors of the Estate of Kimberlee J. Sander, Deceased, Plaintiffs and Appellants,

v.

The GEIB, ELSTON, FROST PROFESSIONAL ASSOCIATION d/b/a Clinical Laboratory of the Black Hills; J.A. Rud, M.D., Defendants and Appellants.

Nos. 17763, 17769, 17803, 17804, 17811, 17818.

Supreme Court of South Dakota.

Argued Jan. 12, 1993.

Decided Sept. 15, 1993.

Glen H. Johnson of Johnson Huffman P.C., Rapid City, SD, Timothy J. Vander Heide of Bakewell, Hauge & Vander Heide, Custer, SD, for plaintiffs and appellants.

William G. Porter and Lonnie Braun of Costello, Porter, Hill, Heisterkamp & Bushnell, Rapid City, SD, for defendants and appellants.

Mark Barnett, Atty. Gen., Sherri Sundem Wald, Asst. Atty. Gen., Pierre, SD, for amicus curiae State of S.D.

Gary D. Jensen of Lynn, Jackson, Shultz & Lebrun, Rapid City, SD, for amicus curiae South Dakota Trial Lawyers Ass'n.

MILLER, Chief Justice.

This case arises out of a medical malpractice action initiated by Kimberlee Sander (Kim) against a clinical laboratory and certain of its employees. A jury found against the defendants and awarded damages of $3.7 million, which the parties had stipulated should be entered only against the laboratory, a professional association under South Dakota law. The trial court applied SDCL 21–3–11, which places a cap on the medical malpractice damages which may be awarded to a plaintiff. Based on that statute, the jury award was reduced to $1 million and judgment was entered thereon. By way of plaintiffs' notices of appeal and defendants' notices of review, this Court is called upon to examine the conduct of the trial below and to determine the scope, application and constitutionality of SDCL 21–3–11. We find no reversible error in the conduct of the trial. We reverse the trial court's application of SDCL 21–3–11 to cap the damages awarded against the professional association and reinstate the jury's award of $3.7 million. We do not reach the constitutional issues.

## FACTS

Kim was just three days past her thirty-fourth birthday when she died of cancer of the cervix on September 5, 1988. She had lived near Custer, South Dakota, with her husband and children ages 15, 12 and 8. During the thirteen years prior to Kim's death, her medical needs had been attended to primarily by Dr. Dennis Wicks, a Custer area general practitioner. Part of her care included routine gynecology examinations which included pap smears. Kim had pap smears taken in Dr. Wicks' office in 1977, 1978, twice in 1980, and again in 1984, 1986 and 1987. All of these pap smears were submitted for evaluation to The Geib, Elston, Frost Professional Association, d/b/a Clinical Laboratory of the Black Hills (Clinical Lab).

Clinical Lab processes approximately 18,000 pap smear slides per year. Its usual procedure during the time relevant to this appeal was to have a clerk assign each smear a number upon its receipt. A stain was then

applied and one of two cytotechnologists[1] would "screen," or examine, each slide under a microscope. In the event the cytotechnologist determined there were abnormal cells present, the sample was marked for later review by a pathologist. If the cytotechnologist felt the abnormality was significant, an additional mark was placed across a label affixed to the slide. At best, only one in ten pap smears screened as "normal" by the cytotechnologists was actually viewed by a pathologist.[2] All pap smears, whether or not actually viewed by a pathologist, were reported out over the signature of one of Clinical Lab's pathologists.

Clinical Lab's cytology reports[3] classified the cells discovered and its pathologists made a recommendation to the patient's physician depending upon the classifications made. The recommendation ranged from a low of "no recommendation" for a Class I screen to (by agreement among Clinical Lab's pathologists) placing a telephone call to the patient's physician in order to quickly obtain additional information. In the event its highest classification was screened (a Class IV), Clinical Lab's pathologists would also recommend a biopsy. Class IV meant malignant cells were present. Occasionally, lower classifications would result in a telephone call to the patient's physician. Clinical Lab frequently received biopsies back on patients following all screenings other than Class I screenings.

Each analysis by Clinical Lab of Kim's pap smears, except its last one in 1987, resulted in a report of "Class I Negative." This classification meant no abnormal/atypical cells were found in the examined pap smear. Clinical Lab's 1987 pap smear reported a "Class IIB," which was suggestive of mild to moderate dysplasia. In other words, premalignant cellular changes were present.

In 1986, Clinical Lab included an additional notation on its "Class I Negative" cytology report to Dr. Wicks, Kim's physician, that there was "moderate inflammation" present. Ordinarily, this "Class I Negative" pap smear would not have been viewed by a pathologist unless by chance it happened to be randomly viewed for purposes of quality control. However, it was the personal practice of Dr. James Rud, Clinical Lab's assigned pathologist at the time, to review all slides where "inflammation" was noted by a cytotechnologist, regardless of whether abnormal cells were also marked for review. Dr. Rud looked at the slide only to determine the extent of "inflammation"; he did not look at the entire slide nor did he look for abnormal cells. Dr. Wicks was at that time treating Kim with antibiotics for an inflammation resulting from a puncture wound to her foot and felt those antibiotics would probably take care of the noted "inflammation" as well.

In September, 1987, Kim returned to Dr. Wicks with complaints of pelvic pain, erratic periods and tiredness. Dr. Wicks conducted a pelvic exam and was disturbed by the results. He could neither feel nor see Kim's cervix, could not feel her ovaries, and could not evaluate her uterus; the entire area was firm, irregular and nodular. He took a pap smear, which he sent to Clinical Lab, and immediately referred her to Dr. Ralph Heirigs, a Rapid City, South Dakota, gynecologist.

On September 17, 1987, Dr. Frost, rather than a cytotechnologist, screened and interpreted Kim's pap smear. In his report to Dr. Wicks, he recommended a biopsy as a result of what he determined was a "Class IIB" smear. At about the time Dr. Frost made his report, Dr. Heirigs examined Kim and took biopsies. These revealed squamous cell carcinoma. He then "staged" her cancer as "IIIB invasive," which meant her cancer had spread to her pelvic bones or lower one-

1. A cytotechnologist is a medical technician employed to microscopically examine the structure of cells on a smear and to detect abnormal cells if they are present.

2. This is in accord with the accreditation standard of the College of American Pathologists. However, Clinical Lab's log book from the time surrounding Kim's 1984 pap smear showed this quality control procedure was not being followed

as only about one in seventy "normal" slides was actually viewed by a pathologist.

3. Cytology reports contain the results of microscopic examinations of cellular material contained in a smear. For example, such an examination might reveal the presence of cells which are cancerous or, though abnormal, are not necessarily cancerous.

third of her vagina.[4] He considered her chances of surviving the next five years to be only twenty-five percent. Dr. Heirigs referred Kim to Dr. Ronald Drummond, a radiation oncologist, who also staged Kim's cancer at "IIIB." He considered her chances of survival to be only twenty percent.

Dr. Drummond asked Clinical Lab to review Kim's 1986 pap smear. Upon re-examination, a pathologist and cytotechnologist from Clinical Lab reported, contrary to the original "Class I Negative" report to Dr. Wicks, that the 1986 smear showed "Class III" cells were present. This classification means cancer is either present or has not invaded, or that cellular changes are present which indicate that malignancy is highly likely.

At Dr. Drummond's request, Dr. Rud also re-examined Kim's 1986 pap smear. His new determination was that the smear contained "Class IIB" cells. This indicated there were mild to moderate dysplastic cells present. This was different, both from his own initial determination of "Class I Negative" and from the recent determination of the other pathologist from Clinical Lab.

When Kim's cancer was finally diagnosed in the fall of 1987, she initially underwent radiation therapy. She was then referred to the University of Minnesota to determine whether she was a viable candidate for radical treatment procedures. However, the cancer had spread and the procedures were not undertaken; Kim had no chance of surviving her cancer.

Clinical Lab was asked by the pathologists at the University of Minnesota to let them examine Kim's prior pap smears. Smears prior to 1984 were not available as Clinical Lab destroys "Negative" slides after three years. However, the smears from 1984, 1986 and 1987 were available and were sent. The interpretations of those slides by the University's pathologists differed significantly from those of Clinical Lab's pathologists. Regarding the 1984 pap smear, the University's pathologists diagnosed cellular changes which, under Clinical Lab's classification system, would be classified "Class IIB," not "Class I Negative" as Clinical Lab reported to Dr. Wicks. The University pathologists also upgraded the 1986 and 1987 pap smears and stated unequivocally that the 1987 pap smear contained malignant cells.

Kim started this lawsuit in July, 1988, ten months after she had been diagnosed with an advanced stage of cancer. Her claims alleged the failure of Clinical Lab and its pathologists to detect and report the presence of cellular changes in routine pap smears in sufficient time to prevent the spread of her cancer. Two months after filing this action, Kim died. After her death, the co-executors of her estate (her husband and sister) were substituted as plaintiffs (Sander). The complaint was amended to include a wrongful death claim in addition to a claim for Kim's pain, suffering and medical expenses.

Trial began October 15, 1991. At the close of the evidence, the trial court dismissed one of the defendants[5] and the remaining parties stipulated that any judgment against any other individual defendant would be entered only against Clinical Lab. The case then went to the jury, which found against Clinical Lab. Sander was awarded damages of $3.7 million.

Prior to the entry of judgment, Clinical Lab's counsel wrote the trial judge requesting to be heard on the applicability of SDCL 21-3-11, the statute which "caps" medical malpractice damages which may be awarded in this State. Sander gave notice of a consti-

4. A *Class* III screen is not to be confused with a *"Stage* III" cancer. "Class" is a cellular abnormality classification. "Stage" is a severity of cancer classification.

5. Dr. Kelley, a Clinical Lab pathologist, was dismissed on the grounds that the statute of limitations had run as against him personally. It was Dr. Kelley who had reported out, under his signature, Kim's 1984 pap smear. He testified he never looked at that pap smear under the microscope since a cytotechnologist screened the smear "Class I Negative." Although the actual slides from earlier years were not available, Clinical Lab's records showed Dr. Kelley's stamped signature was also applied to Kim's 1977 pap smear reports and one of the 1980 pap smear reports. He also reported both of these as "Class I Negative." He never looked at either of these smears under a microscope. Dr. Kelley left Clinical Lab at the end of 1984 and has not practiced medicine since that time.

tutional challenge of the statute to the Office of the South Dakota Attorney General. The trial court requested briefs and scheduled a hearing at which all parties, including the State of South Dakota, were represented.[6]

The trial court held SDCL 21–3–11 is applicable to a damages award against Clinical Lab and is not unconstitutional. The trial court also held that reliance on the statute is not an affirmative defense which needs to be pled, nor is it to be applied to each of Sander's causes of action. The trial court then reduced the jury's verdict from $3.7 million to $1 million. Clinical Lab made additional motions for a new trial, for judgment notwithstanding the verdict, and to deposit the $1 million judgment pursuant to SDCL 15–6–67(a). These motions were denied and judgment was entered for $1 million against Clinical Lab.

Sander filed several notices of appeal and defendants filed several notices of review, all of which have been consolidated. To simplify our discussions, and in view of the parties' stipulation that any judgment awarded by the jury would be entered only against Clinical Lab, references to Clinical Lab are deemed to refer to any, or all, of the other defendants as well. Sander brings several constitutional and non-constitutional attacks against SDCL 21–3–11, which capped the damages as reflected in the judgment. We do not address the constitutional questions.

## PART I

### EVIDENTIARY ISSUES

"The rulings of the trial court are presumptively correct; we have no duty to seek reasons to reverse. The party alleging error must show prejudicial error affirmatively from the record.... [On appeal,] we must determine whether the trial court abused its discretion." *Shamburger v. Behrens*, 380 N.W.2d 659, 661 (S.D.1986); *State v. Holland*, 346 N.W.2d 302, 307 (S.D.1984); *Drier v. Perfection, Inc.*, 259 N.W.2d 496, 503 (S.D. 1977); *Shaffer v. Honeywell*, 249 N.W.2d 251, 258 (S.D.1976). "To show such prejudicial

error an appellant must establish affirmatively from the record that under the evidence the jury might and probably would have returned a different verdict if the alleged error had not occurred." *Alberts v. Mutual Serv. Cas. Ins. Co.*, 80 S.D. 303, 314, 123 N.W.2d 96, 103 (S.D.1963); *K & E Land and Cattle Co. v. Mayer*, 330 N.W.2d 529, 533 (S.D.1983). "The term 'abuse of discretion' refers to a discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence." *Herndon v. Herndon*, 305 N.W.2d 917, 918 (S.D.1981) (citations omitted).

### A. THE 1984 PAP SMEAR SLIDE.

■ One of the issues raised in the complaint was that Clinical Lab was negligent in "inaccurately interpreting [Kim's] pap smear from 1984." Substantial evidence regarding this smear was admitted at trial. Clinical Lab asserts that because this action was commenced July 7, 1988, more than two years after the "inaccurate" 1984 interpretation, it was error for the trial court to submit to the jury the negligence claims based upon the 1984 slide.

Sander argues several grounds to support admission of negligence claims based upon the 1984 slide. We address only the assertion that the statute of limitations is tolled because Kim's visits to Dr. Wicks to have her pap smears taken and submitted to Clinical Lab constituted a continuing treatment relationship with Clinical Lab.

Clinical Lab responds, citing a lower court of New York, that the statute of limitations cannot be tolled because Kim's routine visits to Dr. Wicks to have the pap smears taken and submitted to Clinical Lab for evaluation were "return visits merely to have her condition checked." *Massie v. Crawford*, 78 N.Y.2d 516, 577 N.Y.S.2d 223, 583 N.E.2d 935, 937 (1991) (citation omitted). We have been cited to numerous additional authorities which stand for this proposition. They offer limited guidance as our research discloses most of the cases, which come from New York, were decided in the face of a statute

---

**6.** The State of South Dakota has also filed an amicus brief with us as has the South Dakota

Trial Lawyers Association.

which explicitly bars such visits from tolling the statute of limitations. The balance of the cases are generally factually distinguishable in that the visits all occurred outside the applicable statute of limitations, were solitary visits, or as the majority concluded in *Massie*, the visits were not related to the initial treatment or medical condition.

Clinical Lab's authorities do, however, help clarify the question to be resolved: Whether the 1984 screening and report by Clinical Lab was also the last treatment by Clinical Lab with respect to matters arising out of the 1984 report, or whether the 1984 screening and report was part of a continuing treatment relationship with Clinical Lab.

The medical malpractice statute of limitations in this state requires an action to be brought against a physician within two years of the alleged malpractice. SDCL 15–2–14.1. Likewise, an action against a professional corporation, such as Clinical Lab, must be brought within two years. SDCL 15–2–14.3. Statutes of limitation questions are normally questions of fact to be resolved by the jury, though there are times when this determination can be made as a matter of law. *Schoenrock v. Tappe*, 419 N.W.2d 197, 200 (S.D.1988). The trial court determined it was a question of fact for the jury to determine whether there was a continuing treatment relationship between Kim and Clinical Lab. Nevertheless, the trial court agreed to Clinical Lab's request not to submit the question to the jury. Thus, the trial court decided as a matter of law that there was a continuing treatment relationship between Kim and Clinical Lab. We review the trial court's legal conclusion de novo. *Rusch v. Kauker*, 479 N.W.2d 496, 499 (S.D.1991); *Permann v. Department of Labor*, 411 N.W.2d 113, 117 (S.D.1987).

We have previously recognized the continuing treatment doctrine in *Wells v. Billars*, 391 N.W.2d 668 (S.D.1986). The princi-

ples behind that doctrine were found to be applicable in legal malpractice cases in *Schoenrock*, 419 N.W.2d 197. We elaborated there that a continuing legal representation relationship must be based upon an "ongoing, continuous, developing and dependent relationship." *Id.* at 201. Our statement in regard to legal malpractice actions applies equally to the doctrine of continuing treatment in medical malpractice actions.

Clinical Lab asserts that "information regarding deficiencies in [its testing program] ... had nothing to do with [Kim's] level of trust." We cannot take this assertion seriously. The service provided by Clinical Lab is "critically important to the patient ... [who] is completely dependent upon the professional to screen for [an insidious disease]." *Morgan v. Taylor*, 434 Mich. 180, 451 N.W.2d 852, 858 (1990).[7] *Morgan* did not find it significant that a patient may be "served" rather than "treated" by a health professional and neither do we. As noted by another court:

> The nature of a pathologist's work is such that he rarely, if ever, has a direct physician-patient relationship with an individual—in other words, he never treats patients in a conventional sense—but his work is often the basis upon which the nature of subsequent treatments to be given by the attending physician is determined.... [W]here the pathologist should have reasonably expected that his work would be relied on by other practitioners in determining the mode of treatment we feel it appropriate to impute to that pathologist or diagnostician constructive participation in that treatment so long as it continued.

*Fonda v. Paulsen*, 46 A.D.2d 540, 363 N.Y.S.2d 841, 846 (1975).

The record shows Kim had been going to Dr. Wicks for her gynecology examinations since at least 1977. Using instruments and equipment furnished by Clinical Lab, Dr.

---

**7.** The Michigan court's holding, that there was an ongoing relationship, was limited to the facts before it. This was in part because, during litigation of the case, the Michigan Legislature repealed the statute of limitations the court had applied. Although the court said the relationship between the plaintiff and the defendant had not terminated after each visit, "[p]articularly in light of the contractual arrangement" between the parties, *Morgan*, 451 N.W.2d at 858, the contractual arrangement appears merely to have provided additional emphasis and support for the court's holding rather than being the ground upon which the holding was based.

Wicks performed pap smears which were sent to Clinical Lab for evaluation in an effort to detect cervical cancer which, by all evidence, is a slow-growing cancer best detected by routine pap smears. Indeed, this is the primary purpose for this examination! Dr. Wicks relied upon Clinical Lab's classification system for detecting potential cancer and relied upon its reports to facilitate his choice of therapy or further work-up. Based on Clinical Lab's report to Dr. Wicks, Kim did not seek other testing for cervical cancer.

Although not necessarily determinative of a course of treatment, we note Clinical Lab had an informal program to compare previous pap smears with a current abnormal smear and tried to correlate its pap smear observations with its biopsy observations. We find it particularly relevant that the relationship between Kim and Clinical Lab was not sporadic. Rather, it was routine. Further, during the time relevant to this action, Kim had no contact with another party for her gynecology exams, pap smears or screenings until 1987 when, for the first time, she was referred to a Rapid City gynecologist after she developed severe physical problems.

This situation is in marked contrast to *Schoenrock* where we found the relationship was "sporadic at best." *Schoenrock*, 419 N.W.2d at 201. There, three years and seven months had passed with no contact between the parties. There was "a total absence of any claimed continuing representation *within the period of limitations." Id.* (emphasis in original). Further, that plaintiff sought advice and counsel on the same matter from another individual. Under these facts, Kim and Clinical Lab did have an "on-going, continuous, developing and dependent relationship ... which [was] not sporadic, but developing and involve[d] a continuity of the professional services from which the alleged malpractice stem[med]." *Id.* The trial court did not err in concluding that the 1984 slide was admissible "on the basis that there was a continuing treatment or some variation of that rule."

### B. THE 1987 PAP SMEAR SLIDE.

■ The parties agree that even if Clinical Lab negligently misread the 1987 pap smear

slide, Kim's ultimate course was not affected by any such negligence as she was already terminally ill. Clinical Lab, therefore, asserts the 1987 slide should not have been admitted as it is "entitled to be tried only for acts of alleged negligence that could actually be found to have harmed Sander." When evidence relating to that pap smear was objected to at trial, the trial court allowed the evidence

> for the purpose of allowing the jury to determine whether or not the person who read that slide had the appropriate skill level for a person who's usually performing that type of screening and also for the purpose of the jury determining whether or not there was a pattern of misreading Pap smears. In [contrast to other plaintiffs in cases cited to the court who] attempted to offer. evidence of other cases where physicians allegedly performed acts of malpractice with other patients, ... [t]his is the same patient process, and I think it's for the jury to decide whether or not this has a probative value, only on the issue of negligence.

Clinical Lab declined to accept the trial judge's offer to give an immediate limiting instruction regarding this evidence, preferring to wait until the final jury instructions were given.

After both sides had rested, and outside the presence of the jury, Clinical Lab moved to strike all evidence concerning that slide. In denying the motion, the trial judge found the prejudicial impact of the misreading was outweighed by its probative value. The jury was allowed to consider the evidence "not for the purpose of deciding that there was proximate cause of [Kim's harm from] the alleged reading, but only to determine whether or not there was a violation of the standard of care in 1984 and 1986." This was embodied in jury instruction 14 which reads:

> The alleged failure to properly classify the 1987 Pap smear cannot be the basis of any award of damages, but you may consider this evidence for the following purpose and no other: Whether the alleged failure to properly classify the 1987 Pap smear tends to show that Defendants lack the required

standard of professional learning, skill and care to properly read and classify either the 1984 or 1986 Pap smear or both.

This instruction was not objected to by Clinical Lab when proposed by the trial court. Clinical Lab asserts the trial court's ruling admitting the evidence was "unquestionably" erroneous and, on appeal, further objects because the court "essentially" told the jury "the *only* purpose of the admission of the 1987 slide ... was to allow the jury to find negligence upon the occasions under inquiry through proof that at another time the laboratory committed a similar act." Clinical Lab argues that the trial court's "errors" are of such a magnitude as to warrant a new trial. We are not persuaded.

 The party alleging a ruling of the trial court is erroneous "must prove not only error in the instructions, but prejudicial error to the effect that under the evidence, the jury might and probably would have returned a different verdict." *Darrow v. Schumacher*, 495 N.W.2d 511, 518 (S.D.1993); *Stormo v. Strong*, 469 N.W.2d 816, 825 (S.D. 1991) (internal quotations omitted). Further, the party alleging error "must show prejudicial error affirmatively from the record." *Shamburger*, 380 N.W.2d at 661.

Clinical Lab notes that in making its ruling the trial court referred to Federal Rule of Evidence 404. Rule 404 addresses the use of character and other acts evidence. The South Dakota counterpart to this Rule is found at SDCL 19–12–4 & 5 and is substantially similar.[8] We have little guidance from this Court's previous decisions on the civil application of SDCL 19–12–4 & 5. *See Durham v. Ciba–Geigy*, 315 N.W.2d 696, 699 (S.D.1982). Our discussions on the application of these statutes have been mainly confined to the criminal context. In that context, evidence of past behavior is generally not admissible when offered to prove a defendant acted in conformity therewith on the most recent occasion, though it may be admissible for other purposes. *E.g., State v.*

*Iron Shell*, 336 N.W.2d 372 (S.D.1983) (evidence of husband's prior physical abuse of spouse relevant to show pattern of physical abuse at his trial for murder of wife), *rev'd on other grounds, Iron Shell v. Leapley*, 503 N.W.2d 868 (S.D.1993).

Here, however, the situation is reversed. The trial court's jury instruction showed that the evidence of the most recent occasion, 1987, was being used to prove a defendant acted in conformity therewith on past (1984 & 1986) occasions. We agree with the trial court that it is significant that the "similar acts" Clinical Lab complains of were the misread 1984, 1986 and 1987 pap smears of the same patient—Kim—by, in each instance, Clinical Lab. The misreadings did not concern unrelated instances of other patients' misreadings. That would be an entirely different question than we are herein presented. *See, e.g., Kentucky–West Virginia Gas Co. v. Slone*, 238 S.W.2d 476 (Ky.1951) (evidence of a well operator's actions on other occasions is not admissible); *Rayburn v. Day*, 126 Or. 135, 268 P. 1002 (1928) (evidence that on a prior occasion a doctor had left a sponge inside another patient's body after surgery was inadmissible to show negligence by the same doctor who had left a sponge inside another patient). *Accord, Lefcourt v. Jenkinson*, 258 A.D. 1080, 18 N.Y.S.2d 160 (1940).

 We determine the trial court did not err in its post-trial ruling or its jury instruction. However, even if the trial court had erred, Clinical Lab, despite its assertions to the contrary, has not shown unfair prejudice as a result of the trial court's decisions. At most, the disputed evidence was harmless as it was merely cumulative to other testimony. *State v. Younger*, 453 N.W.2d 834, 839 (S.D. 1990); *State v. Fender*, 358 N.W.2d 248, 254 (S.D.1984). The trial court found, and we agree, that there was "testimony saying that a defendant missed what was obvious on a slide. That's direct testimony and opinion

---

**8.** Federal Rule of Evidence 404 is identical to its counterpart in South Dakota where relevant to our discussions:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in con-

formity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

SDCL 19–12–5 (Rule 404(b)).

testimony[.]" For example, Dr. Rud, Clinical Lab's pathologist who examined Kim's 1986 pap smear, acknowledged at trial that Clinical Lab should have been able to screen either the "Class IIB" or "Class III" cells on the 1986 pap smear and could offer no explanation for Clinical Lab's failure to do so.

Clinical Lab's own expert agreed with Dr. Rud. Although he testified that Clinical Lab's "underclassifications" were reasonable if the slides were viewed prospectively, rather than with the assistance of hindsight by one who expects to find cancer in the slides, he nevertheless did find malignant cells in Kim's 1984 pap smear. Clinical Lab's expert also acknowledged that none of Kim's 1984, 1986 or 1987 pap smears were accurately reported by Clinical Lab. There is sufficient evidence from which the jury could conclude, even without the aid of evidence relating to the 1987 slide, that Clinical Lab was negligent in reading Kim's 1984 and 1986 slides.

We note Sander has urged several additional purposes for admitting the evidence relating to the 1987 pap smear slide. These include proof of Clinical Lab's failure to follow appropriate standards of care, proof of a pattern of conduct in misscreening and misreading Kim's pap smears, illustrating with the slide itself previous oral and handwritten descriptions of what invasive cancer actually looks like, proof on the claim that Clinical Lab's lack of skill and care allowed Kim's cervical cancer to go undetected and undiagnosed by Clinical Lab until after the 1987 pap smear was taken, proof on the claim that Clinical Lab was negligent in failing to adequately monitor, supervise, screen and employ safeguards and procedures to insure accuracy in detecting, interpreting and reporting abnormalities in Kim's pap smears, and as proof on the claim of negligence on the part of Clinical Lab's selection and review of competent medical staff.

The trial court did not articulate that it was allowing the admission of evidence relating to the 1987 slide based on this latter argument, although jury Instruction 16 stated: "It is also the duty of such a laboratory to use reasonable care in selecting a competent medical staff and periodically reviewing the competency of its medical staff." This is clearly a proper purpose for the admission of evidence relating to the 1987 pap smear. In light of the record before us, we hold the trial court did not abuse its discretion in admitting this evidence.

## C. THE ADMISSION OF CHARACTER EVIDENCE.

■ The trial court allowed a portion of the personnel records of Clinical Lab to be submitted to the jury. This evidence came in by way of deposition testimony of Karen Baer, a cytotechnologist who had been a co-worker of Norma Hellman, the cytotechnologist who had examined Kim's 1984 and 1986 pap smear slides. The evidence tended to show Hellman was "sloppy" in her work habits in that she hurried through the screening process. It also reflected that Baer had conveyed her concerns and observations about those work habits to a supervisor at Clinical Lab. Other evidence from that personnel file was withheld from the jury by the trial court.

Sander asserts this evidence was properly before the jury on its claim of negligence by Clinical Lab in failing to adequately monitor, supervise, screen and employ safeguards and procedures to insure accuracy in the interpretation of cytologies. Clinical Lab asserts the trial court erroneously admitted this evidence over its objections. "When reviewing evidence presented by deposition, we do not apply the clearly erroneous rule but review that testimony as though presented here for the first time." *Day v. John Morrell & Co.*, 490 N.W.2d 720, 723 (S.D.1992).

Clinical Lab relies on *Rocky Mt. Helicopters v. Bell Helicopters Textron*, 805 F.2d 907 (10th Cir.1986), as support for its position that the disputed evidence is inadmissible. In that case, the evidence sought to have been admitted would have shown the employer may have known that the employee in question was not properly trained and was "potentially unsafe." *Id.* at 916. On appeal, it was found the proffered evidence was relevant and "arguably admissible" on that issue. Therefore, "the district court erred in ... exclud[ing] evidence that Rocky Mountain may have known that [its employee] was an unsafe pilot." *Id.* at 916–17.

As did the *Rocky Mt.* court, we also determine the disputed evidence in the instant case is relevant to the question of negligent monitoring by Clinical Lab. However, that does not end our inquiry. Nor did it end the inquiry of the *Rocky Mt.* court.

That court went on to note the trial court had other reasons for excluding the evidence regarding the employee's work habits and noted that under Federal Rule of Evidence 404, an individual's alleged substandard work habits generally are "not admissible for the purpose of proving that a person acted in conformity therewith on a particular occasion [as such] evidence is generally regarded as being of slight probative value and potentially very prejudicial." *Id.* at 917. Thus, Federal Rule of Evidence 403 also came into play:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

We have adopted this Rule in its entirety at SDCL 19–12–3. *Rocky Mt.* continued:

> The notes of the Advisory Committee on Federal Rules of Evidence for Rule 404 indicate that where character evidence is offered for a purpose other than showing actions consistent therewith, there is no "mechanical solution" for admitting or excluding the evidence. According to the Committee, the determination must be made "whether the danger of undue prejudice outweighs the probative value of the evidence," *a determination which lies squarely with the discretion of the trial court.*

*Id.* at 917 (emphasis added). The *Rocky Mt.* court found the trial court did not abuse its discretion when it determined that under the circumstances of that case the evidence, which was otherwise "arguably admissible," was unduly prejudicial.

Clinical Lab asserts the disputed evidence should have been excluded as it was used improperly in Sander's closing argument as direct evidence of Clinical Lab's negligence in screening the slides at issue. We have said that SDCL 19–12–3 (Rule 403) allows the trial court to exclude otherwise relevant evidence "if the evidence, as admitted, would provide the jury with an undue tendency to decide the case on an improper basis." *Shamburger,* 380 N.W.2d at 661. The relevant portion of Sander's closing argument to the jury was:

> [The defense's expert] has indicated in his testimony that [the pap smear] isn't a very good test, if you will recall that, but that it makes up for itself over time. In other words, that time takes care and justifies missing pap smears, misreading them. That may be—maybe that's true, generally, that time would take care of that, unless, because of that assumption the test is taken for granted. And if you start out with the assumption that time is going to cure your mistakes so that you then are less careful and somebody is going to pick it up the next time, or if not the next time, then the next time after that, what happens is you start getting careless. And that's what happened in this case. People started getting careless.
>
> The court's instructed you that it is the duty of one who undertakes to perform the service of a pathologist or a cytotechnologist to have the knowledge or skill ordinarily possessed and to exercise the care and skill ordinarily used in like cases. *Failure to do that is negligence. The key word is care. You have to be careful to not rush through screening to look at the entire slide when you are doing this. So that until you are able to rule out cancers, you better check them out. Its care we are talking about.* (Emphasis added).

Clinical Lab asserts the emphasized language was so prejudicial as to require a new trial. A review of the extensive record before us reflects that, with the exception of the phrase "not rush through screening," the emphasized language is as likely to be in reference to, and attributable to, the testimony of witnesses other than that obtained from the personnel records.

 Regarding the phrase "not rush though screening," and a subsequent reference a short time later by Sander to Baer's

concern about Hellman's "rushing through pap smears," we note that a party is not "prejudiced" merely because his position is harmed by the evidence. Rather, there must be an unfair advantage gained by the opposing party through evidence which persuades the trier of fact by illegitimate means. *Kaarup v. Schmitz, Kalda & Assocs.*, 436 N.W.2d 845, 850 (S.D.1989). There were repeated references by witnesses to the fact that Clinical Lab did not always look at pap smear slides in their entirety. Evidence that Kim's cytotechnologist may have "rushed through pap smears" may have been damning, but in view of other evidence before the jury, we are not persuaded its relevance was outweighed by its prejudicial effect. The trial court did not abuse its discretion when it admitted the personnel records.

We now turn to issues raised regarding the verdict and a subsequent tender by Clinical Lab to deposit the judgment amount with the court.[9]

### D. THE JURY AWARD.

■ The jury returned a verdict against Clinical Lab and awarded lump-sum damages of $3.7 million. Clinical Lab then moved for a remittitur to not more than $438,000, which motion was denied. Clinical Lab asserts it is entitled to a new trial or, in the alternative, a new trial as to damages alone or an order or remittitur to a reasonable sum [10] as the jury's verdict was the result of passion, partiality and prejudice.

■ "[T]he amount of damages to be awarded is a factual issue to be determined by the trier of fact, [and] we review the issue on appeal under the clearly erroneous standard." *Flagtwet v. Smith*, 393 N.W.2d 452, 455 (S.D.1986) (*Flagtwet II* ). We will not let stand a verdict if it "is so excessive as to strike mankind, at first blush, as being beyond all measure, unreasonable, and outra-

geous and such as manifestly shows the jury to have been actuated by passion, partiality, prejudice or corruption. The fact that a verdict is extremely liberal is not grounds for a new trial." *Small v. McKennan Hosp.*, 437 N.W.2d 194, 203–04 (S.D.1989); *Weidner v. Lineback*, 82 S.D. 8, 20, 140 N.W.2d 597, 603 (1966).

■ Kim initiated this action to recover damages for personal injuries. When she died, the complaint was amended by the co-executors of her estate to include a wrongful death cause of action. It is, therefore, appropriate to recall that "[i]n every action for wrongful death the jury may give such damages as they may think proportionate to the pecuniary injury resulting from such death to the persons respectively for whose benefit such action shall be brought." SDCL 21–5–7; *Flagtwet v. Smith*, 367 N.W.2d 188, 189 (S.D.1985) (*Flagtwet I* ). A pecuniary injury encompasses more than strictly economic losses in that it includes "the loss of decedent's companionship and society as expressed by, but not limited to, the words 'advice,' 'assistance,' and 'protection,' but without consideration for the grief and mental anguish suffered by the beneficiaries because of the wrongful death." *Flagtwet I*, 367 N.W.2d at 191. The monetary value of the loss of consortium cannot be determined according to a definite rule. *Flagtwet II*, 393 N.W.2d at 455; *Morey v. Keller*, 77 S.D. 49, 54, 85 N.W.2d 57, 60 (1957). And, as with a jury award for personal injuries, we "have allowed the trier of fact 'wide latitude' " in making its award. *Flagtwet II*, 393 N.W.2d at 455.

■ Kim was thirty-four years old at the time of her death. At trial, there was testimony that the monetary value of Kim's loss to the family was $388,000. Funeral, medical and other expenses of $51,000 were also proved. In closing argument to the jury, the

---

9. Clinical Lab has also raised issues regarding certain expert testimony on the standard of care and other courses of treatment. After careful consideration, we find no reversible errors on these additional evidentiary questions.

10. Even though the trial court finds a verdict is excessive, unconditional remittitur is not available under our Rules of Civil Procedure. How-

ever, a trial court can deny a "motion for new trial on the condition that the prevailing party consent to a reduction in damages. Therefore, the court [can provide] the recovering party the option of accepting the remittitur or a new trial under SDCL 15–6–59(a)(5)." *Smith v. Highmore Farm Ltd.*, 489 N.W.2d 908, 913 (S.D.1992) (citations omitted).

monetary value of Kim's pain and suffering was asserted to be $1,000,000. Kim greatly suffered many faces of pain during the year following the realization that she would die from the very disease which the pap smear was designed to detect. The enormity of Kim's knowledge of her impending, unalterable doom, her confusion, fear, misery, depression, helplessness, physical pain and mental terror, her sure knowledge that she would never live to witness the adulthood of her children or old age with her husband, all were proper considerations for the jury and surely had a powerful influence upon it.

The jury was informed, in Instruction 23, of numerous other elements of damage which it could bear in mind in this combined personal injury and wrongful death action. These included

> the instruction, moral training and superintendence of education [Kim] might reasonably have given her children had she lived; [the] counsel, guidance and aid [Kim] would reasonably have given [her husband] had she lived; [and] the loss of advice, assistance, companionship, society and protection [Kim] would presumably have given [her husband] and children had she lived.

Sander's counsel argued to the jury in closing that the monetary value of Kim's advice, companionship, moral training, education and aid as mother to her children, who were 15, 12 and 8 years old at the time of her death, amounted to $480,000 per child and the monetary value of those losses to her husband was $890,000. The total damages awarded by the jury were approximately $69,000 less than argued by counsel.

Clinical Lab did not argue damages in closing arguments to the jury. Even so, Clinical Lab asserts the jury's award cannot stand as "the jury's passion is so evident." It argues that *Bethel v. Janis*, 597 F.Supp. 56 (D.S.D.1984), clearly demonstrates these damages were excessive. We have examined *Bethel*, keeping in mind that only applications of South Dakota law by this Court are binding on us.

We are struck that any similarity between the instant case and *Bethel* ends with the observation that both are wrongful death and

personal injury actions. Though both parents there died, and injuries were sustained by two of their children, the deaths were quick, if not instantaneous, and the injuries sustained were comparatively minor and short-lived. Further, evidence submitted in that trial to the court on the majority of the damages alleged, was often "perfunctory at best" or nonexistent.

Clinical Lab also argues this case is "indistinguishable" from *Zaninovich v. American Airlines*, 26 A.D.2d 155, 271 N.Y.S.2d 866 (1966). *Zaninovich* was a wrongful death action brought on behalf of minor children whose parents had both died instantly in an airplane crash. *Zaninovich* did not include a cause of action for personal injuries, pain or suffering sustained by the deceased parents. That court found the damages awarded were excessive and explained: "The gross excessiveness of the principal awards is easily demonstrated [because it puts the surviving children] far above the standard of living to which they were accustomed[.]" *Id.* at 872. Further, that court concluded, as Clinical Lab argues we should conclude, that this change in the standard of living was alone sufficient to show the jury award was unreasonable. *Id.*

We are not persuaded by that lower New York court's focus on placing survivors in a standard of living equal to that to which they were accustomed prior to the death of the father, the only wage-earning parent. We have not been cited to, nor has our research uncovered, any instance where any court, including the courts of New York, have adopted this philosophy. We decline to adopt what the *Zaninovich* court itself called a "crude analysis."

■ Significantly, we note the trial court specifically found the jury did not act out of an "excess of emotion" and that their reactions to the testimony "wasn't an unmeasured or inappropriate response[.]" Just as we defer to "[t]he trier of fact [as] the exclusive judge of the credibility of the witnesses," unless clearly erroneous, *Wolff v. Royal Ins. Co. of America*, 472 N.W.2d 233, 236 (S.D. 1991), so too do we defer to the determina-

tion of the trial judge as to the total effect of trial testimony on a jury panel.

Finally, we bear in mind that we have not found any prejudicial errors by the trial judge in the course of the trial which would lend support to a finding of excessive damages. *E.g., Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 283 (5th Cir.1975). A review of the record does not leave us with the opinion that, under all the facts of this case, this award was "beyond all measure, unreasonable, and outrageous and such as manifestly shows the jury to have been actuated by passion, partiality, prejudice or corruption." *Small*, 437 N.W.2d at 203–04; *Weidner*, 82 S.D. at 20, 140 N.W.2d at 603.

### E. THE TENDERED $1,000,000 POST-JUDGMENT IN–COURT DEPOSIT.

■ The trial court reduced the jury's damages award of $3.7 million to $1 million, over Sander's objections, and entered judgment against Clinical Lab for that amount. *See Part II, infra.* Shortly thereafter, Sander refused Clinical Lab's offer to pay the judgment for satisfaction. Sander then filed this appeal and Clinical Lab moved, pursuant to SDCL 15–6–67(a), for an order allowing it to deposit with the court the judgment amount "so that interest on the judgment under SDCL 54–3–5.1 shall cease to accrue as of the date of deposit, with the deposit to be paid to [Sander] only in the event that a judgment in favor of [Sander] is upheld by the South Dakota Supreme Court." Sander resisted the motion; briefs were submitted and a hearing was held. During the hearing, Clinical Lab requested that it also be allowed to deposit costs and an additional amount of $27,333.06, which represented the total accumulated interest on the judgment to the date of the hearing. The trial court denied the proposed deposit holding it was not "unconditional."

Clinical Lab asserts the trial court was "mistaken" in its view of the law. Sander, though agreeing with the trial court's rejection of the tendered deposit, argues that SDCL 15–6–67(a) is not even available to Clinical Lab, in that the statutory scheme in this state prescribes the only course of conduct for Clinical Lab to follow if it desires to delay satisfying the judgment pending the outcome of an appeal. Before we may address the correctness of the trial court's holding that Clinical Lab's tendered deposit was not "unconditional," we must address Sander's threshold question of whether SDCL 15–6–67(a) is even available to Clinical Lab.

■ We begin our determination by recalling that "construction of a statute is a question of law and thus, the decision below is fully reviewable without deference to the decision of the trial court." *Reid v. Huron Bd. of Educ.*, 449 N.W.2d 240, 242 (S.D.1989). "Moreover, when the question is which of two enactments the legislature intended to apply to a particular situation, 'terms of a statute relating to a particular subject will prevail over general terms of another statute.'" *Nelson v. School Bd. of Hill City*, 459 N.W.2d 451, 454 (S.D.1990) (quoting *Meyerink v. Northwestern Pub. Serv. Co.*, 391 N.W.2d 180, 184 (S.D.1986)). The rules of procedure in the circuit courts, and the rules of appellate procedure relevant to this appeal, are rules promulgated by this Court and, although codified, are not legislative enactments. We are, therefore, uniquely situated to determine the intent and application of our own rules.

It is provided that the procedure to be followed by a party who seeks a stay of execution on a judgment "upon appeal shall be as provided in chapter 15–26A." SDCL 15–6–62(d). The chapter therein referred to contains our Rules of Appellate Procedure. Those rules contain two sections relevant to our discussion. The first reads:

> An appeal from a judgment or order shall not stay enforcement of proceedings in the circuit court [other than for certain exceptions not here relevant] unless the appellant executes a supersedeas bond in the amount and form approved by the circuit court or otherwise complies with the provisions of this rule.

SDCL 15–26A–25. Although this statute appears only to apply to an "appellant," under the facts of this case, there can be no serious dispute as to whether the terminology in fact is addressed to Clinical Lab. In the usual

case, the appellant will be the party against whom the judgment was entered. Here, although it is Sander who appeals, we note Sander appeals only the reduction of the jury's award of damages and the resultant judgment as entered. Sander, unlike Clinical Lab, does not dispute its entitlement to even the "minimum" amount reflected in the judgment, while Clinical Lab, by a notice of review, appeals entitlement to, and the amount of, the judgment. Therefore, even though it is Sander who is the appellant here, we view the word "appellant" under these facts to refer to the party appealing entitlement to the judgment entered, in this case, Clinical Lab.

■ The other relevant section of our Rules of Appellate Procedure sets the terms of the supersedeas bond referred to above:

If the appeal is from a judgment directing the payment of money, the conditions of the bond required by § 15–26A–25 shall be the payment of the judgment or that part of the judgment which is affirmed together with interest thereon from the date of the judgment.

SDCL 15–26A–26. We interpret statutes "according to its manifest intent as derived from the statute as a whole, as well as other enactments relating to the same subject." *Meyerink*, 391 N.W.2d at 184. Therefore, we note that while our procedural rules use the word "interest," it is the legislature which has defined that term and set the rates. "Interest is the compensation allowed by law for the use, or forbearance, or detention of money or its equivalent[,]" SDCL 54–3–1, and is payable on all judgments, other than certain exceptions not here relevant, "at the Category B rate of interest as established in § 54–3–16 from and after the date of judgment[.]" SDCL 54–3–5.1. The Category B rate of interest is twelve percent per annum. SDCL 54–3–16.

We conclude the procedure outlined in the statutes is complete in its outline concerning the handling of funds which are the subject of a judgment. This includes a legislative determination that the interest to be paid on judgments is that rate as set out in the statutes. Thus, statutory enactments appear to preclude an in-court deposit of judgment

funds which are subject to fluctuating market rates of interest. However, it is necessary to examine the procedural rule found at SDCL 15–6–67(a) to determine how, if at all, that rule fits into the scheme as outlined.

In an action in which any part of the relief sought is a judgment for a sum of money or the disposition of a sum of money or the disposition of any other thing capable of delivery, a party, upon notice to every other party, and by leave of court, may deposit with the court all or any part of such sum or thing. Money paid into court under § 15–6–67 shall be deposited and withdrawn as ordered by the court.

SDCL 15–6–67(a). A plain reading makes it apparent that it is not directed by its terms to an application to a particular stage of a proceeding or to a particular participant in a proceeding. In light of the complete statutory scheme in South Dakota as outlined above, we are inclined to agree with Sander that Clinical Lab cannot use the general deposit provision found at SDCL 15–6–67(a) to toll the accumulation of post-judgment interest at the statutory rate of twelve percent per annum.

Nevertheless, we address Clinical Lab's assertion that SDCL 15–6–67(a) provides an alternate method for a judgment debtor to delay paying to the judgment creditor the judgment, to which he is otherwise entitled, while at the same time tolling the accumulation of post-judgment interest. Clinical Lab finds "ample federal authority" to support its position and refers us to *Fassbinder v. Pennsylvania R.R. Co.*, 233 F.Supp. 574 (W.D.Pa. 1964), to have us find that SDCL 15–6–67(a) "is certainly broad enough to authorize the payment into court of a judgment and costs in order to stop the running of interest thereon if such is desired." *Id.* at 576.

■ South Dakota has generally adopted the Federal Rules of Civil Procedure, including Rule 67, upon which SDCL 15–6–67(a) is based. Though federal interpretations of federal civil and appellate procedural rules are not binding on us in an interpretation of like rules in our State's courts, it is appropriate to "turn to the federal court decisions for guidance in their application and interpretation." *Wilson v. Great N. Ry. Co.*, 83 S.D.

207, 211, 157 N.W.2d 19, 21 (1968); *Brasel v. Myers*, 89 S.D. 114, 116, 229 N.W.2d 569, 570 (1975).

We believe Clinical Lab has misplaced its reliance on *Fassbinder*. That defendant had not attempted to avail itself of Clinical Lab's argument and was found to be liable for post-judgment interest. We also note that Clinical Lab supports its argument with only that portion of a single sentence which is favorable to it. The complete sentence reads: "*Rule 67, Fed.R.Civ.P., when read in conjunction with 28 U.S.C. § 2041*, is certainly broad enough to authorize the payment into court of a judgment and costs in order to stop the running of interest thereon if such is desired." *Fassbinder*, 233 F.Supp. at 576 (emphasis added). 28 U.S.C. § 2041 specifically authorizes the deposit into federal court of money in adjudicated cases. Unlike *Fassbinder*, we have not been directed to a comparable statute in the South Dakota Code which we too can read in conjunction with SDCL 15–6–67(a) to authorize the in-court deposit proposed by Clinical Lab.

We are of the opinion that Clinical Lab's federal authorities do not support its argument that Federal Rule 67, standing alone, authorizes even a federal court to accept a post-judgment in-court deposit of funds which are subject to a judgment. Therefore, Clinical Lab's authorities do not support its argument that the South Dakota counterpart to Rule 67, standing alone, authorizes a South Dakota court to accept a post-judgment in-court deposit of funds which are subject to a judgment.

Moreover, *Schmidt v. Iowa Beef Processors*, 347 N.W.2d 897 (S.D.1984), which represents our limited opportunity to comment on the application of SDCL 15–6–67(a), was applied only in the context of prejudgment interest. In view of the complete statutory scheme outlined above, we hold SDCL 15–6–67(a) is not properly available in the first instance to Clinical Lab, or any other defendant in South Dakota, for a post-judgment in-court deposit of funds subject to a judgment. Therefore, the trial court erred when it looked to SDCL 15–6–67(a) for guidance in the disposition of funds subject to a judgment. Therefore, we need not decide whether the trial court was correct in its determination that Clinical Lab's tender was not "unconditional" pursuant to SDCL 15–6–67(a). It is clear, nevertheless, that the trial court's determination is correct. Further, the conditions sought to be imposed by Clinical Lab are substantial. The trial court reached a correct result when it refused the proposed tender. Consequently, we affirm the trial court's result "even though it is based on a wrong reason." *Seymour v. Western Dakota Voc. Tech. Inst.*, 419 N.W.2d 206, 209 (S.D.1988).

In sum, we affirm the trial court in its conduct of the trial.[11] We turn now to a discussion of the issues raised by the trial court's application of SDCL 21–3–11 to limit the damages awarded by the jury in this medical malpractice action.

## PART II

## LIMITATION ON DAMAGES AWARDED FOR MEDICAL MALPRACTICE: SDCL 21–3–11

The South Dakota Legislature has limited the medical malpractice damages which may be awarded a plaintiff in this state:

In any action for damages for personal injury or death alleging malpractice against any physician, chiropractor, dentist, hospital, registered nurse, certified registered nurse anesthetist, licensed practical nurse or *other practitioner of the healing arts under the laws of this state*, whether taken through the court system or by binding arbitration, the total damages which may be awarded may not exceed the sum of one million dollars.

SDCL 21–3–11 (emphasis added). After the jury returned a verdict against Clinical Lab, but before judgment was entered, the trial court, at the request of Clinical Lab, applied this statute to reduce the jury's award of $3.7

---

**11.** The parties raise a question regarding the conduct of counsel at trial. After careful review of the record, we find the conduct of all counsel within the bounds of zealous advocacy. Further, we do not find it necessary to consider the issues raised by the parties in the event of a new trial, as we do not remand for a new trial.

million damages to an award of $1 million. Judgment was then entered thereon against Clinical Lab per the parties' earlier stipulation that any judgment against any defendant would be entered against only it.

Sander raises numerous issues regarding SDCL 21–3–11. We address three non-constitutional issues touching on the application of this statute, each of which raises questions of law. We review the trial court's resolutions of these issues de novo. *Reid,* 449 N.W.2d at 242. We resolve this action on the first of these issues.

### A. WHETHER SDCL 21–3–11 BENEFITS CLINICAL LAB.

■ Medical corporations can only be formed by individuals who are licensed to practice medicine and when the corporations are established "for the study, diagnosis and treatment of human ailments and injuries, whether physical or mental." SDCL 47–11–1. Further, only corporate employees who are licensed pursuant to the Medical Practice Act may provide "medical or surgical treatment, consultation or advice[.]" *Id.* Clinical Lab, a professional association, is such a medical corporation and is engaged in the business of offering laboratory facilities and services. The parties dispute whether Clinical Lab is a "practitioner of the healing arts" within the meaning of SDCL 21–3–11. If Clinical Lab is such a "practitioner," it can avail itself of that statute's damages limitation benefit.

As originally enacted in 1976, SDCL 21–3–11 limited to $500,000 the general damages which could be awarded, but did not limit the special damages which could be awarded. 1976 S.D.Laws Ch. 154, § 1. This benefit applied only to causes of action arising between 1976 and 1986, and then only to certain classifications of individuals, as well as to sanitoriums and hospitals. *Id.* §§ 1 & 2. In 1978, the listing of named benefitted individuals was expanded. 1978 S.D.Laws Ch. 154. In 1986, the list of benefitted individuals was again expanded, though sanitoriums were de-

leted from the list of benefitted entities, leaving hospitals as the only benefitted entity. 1986 S.D.Laws Ch. 172.[12] The 1986 amendments also extended the statute's benefit of a limitation on an award of damages to "other practitioner[s] of the healing arts." *Id.*

In *Cunningham v. Yankton Clinic, P.A.,* 262 N.W.2d 508 (S.D.1978), we had occasion to examine a statutory listing of individuals and entities to determine whether a non-listed entity received the statutory benefits. In that case, the plaintiffs had brought a medical malpractice action against the Yankton Clinic. That medical corporation asserted a two-year statute of limitations defense. The language of the two-year statute of limitations enumerated individuals and entities who were benefitted by the two-year time period, but did not include medical corporations. We said there that we would not "enlarge a statute beyond its face where the statutory terms are clear and unambiguous in meaning and do not lead to an absurd or unreasonable conclusion." *Id.* at 510. We refused to extend the unambiguous list to include medical corporations and held the action had been timely brought within the applicable three-year limitations period.

Following that 1978 decision, the legislature enacted SDCL 15–2–14.3, a new provision which specifically provided that professional corporations, including medical corporations, would benefit from the same limitations period as would the individual professionals who were stockholders of the corporation, *i.e.,* two years. However, SDCL 21–3–11, was not amended to include medical corporations, nor was a special provision enacted extending a similar protection to medical corporations, even though the lists at issue in *Cunningham* and in SDCL 21–3–11 were practically identical. Clearly, when the legislature wants to include a medical corporation as a beneficiary of its enactments, it knows how to do so.

Although the plain list of individuals and entities which are benefitted by SDCL 21–3–11 does not include a medical corporation,

**12.** Also in 1986, the damages ceiling was raised to $1,000,000 and became applicable to all damages. 1986 S.D.Laws Ch. 172. The statute had been amended the previous year to repeal the ten-year time frame for which the statute's limitations benefit had been available. 1985 S.D.Laws Ch. 167.

our deliberations are not complete. We must determine whether a medical corporation is one of the "other practitioner[s] of the healing arts" added in the 1986 amendments to SDCL 21–3–11. We conclude only a natural person can be a "practitioner" and that the legislature intended this phrase to extend the benefits of SDCL 21–3–11 to unnamed natural persons, not to unnamed entities.

We are aided in our conclusion, that a "practitioner" of the healing arts cannot be an entity, by our discussion in South Dakota *Physician's Health Group v. State*, 447 N.W.2d 511 (S.D.1989). We said there that a "practitioner of such an art is one who engages in, or offers to engage in, or holds himself or herself out as qualified to engage in such an art, and holds a legal and unrevoked license or certificate, issued by the State of South Dakota, under which he or she practices." *Id.* at 514. Although our decision in that case was not necessarily dependent upon the recited definition, we now hold that *Physician's Health Group* defines a "practitioner" in the context of the healing arts.

Clinical Lab asserts it can be a "practitioner" because "person" is statutorily defined to include "natural persons, partnerships, associations, and corporations[.]" SDCL 2–14–2(18). Though Clinical Lab is generally correct, that statute also includes important qualifying language "unless the context otherwise plainly requires[.]" *Id.* The language of the *Physician's Health Group* definition—"one who engages in," "himself or herself," "holds a legal and unrevoked license," and "he or she"—can refer only to a natural person able to be licensed under the Medical Practice Act. It is important to remember that a corporation cannot obtain this license; it can only be obtained by the people associated with the corporation.

■ We have, on occasion, found individuals to be "practitioner[s] of the healing arts" even though they were not licensed under the Medical Practice Act. However, unlike a corporation, those *individuals* were capable of becoming licensed under the Medical Practice Act. *Fjerstad v. Knutson*, 271 N.W.2d 8 (S.D.1978), (an unlicensed intern was engaged in the practice of medicine); *Nelson v.*

*Palmquist*, 363 N.W.2d 570 (S.D.1985) (an unlicensed chiropractor was practicing a healing art). Our case law leads but to one conclusion: A "practitioner" is a natural person.

We also find statutory support for the conclusion that a practitioner must be a natural person from the language of SDCL ch. 36–2. That chapter refers to practitioners of healing arts in general and recites:

Terms used in this chapter [36–2], unless the context otherwise requires, mean:

. . . .

(3) "Healing art," "healing," "art of healing," "practicing healing," "practicing of healing," [-] any system, treatment, operation, diagnosis, prescription, or practice for the ascertainment, cure, relief, palliation, adjustment, or practice for the ascertainment, cure, relief, palliation, adjustment, or correction of any human disease, ailment, deformity, injury, unhealthy or abnormal physical or mental condition[.]

SDCL 36–2–1(3). This language is not, on its face, confined in its application to natural persons. However, in addition to this language, we review other enactments relating to the same subject. *Meyerink*, 391 N.W.2d at 184. The language throughout the balance of the general chapter only makes sense when interpreted to mean a natural, not a corporate, person.

We conclude the language of statutory *and* case law plainly requires a "practitioner" to be a natural person. We therefore hold the term "other practitioner of the healing arts" does not include entities such as Clinical Lab, a medical corporation. Thus, the trial court erred in applying SDCL 21–3–11 to reduce the jury's determination of $3.7 million damages to an award of $1 million. Its judgment of an award of $1 million damages against Clinical Lab is reversed. The trial court is instructed to enter judgment which reflects the jury's determination of the damages suffered by Sander as a result of the medical malpractice of Clinical Lab.

Our determination, that SDCL 21–3–11 does not benefit Clinical Lab, removes the

necessity to address any of the remaining issues raised regarding that statute. Nevertheless, because several of the questions raised are capable of repetition in future medical malpractice actions, we will resolve two of the more important questions. *See Physician's Health Group,* 447 N.W.2d at 515; *Rapid City Journal v. Circuit Court,* 283 N.W.2d 563, 565 (S.D.1979).

## B. *WHETHER SDCL 21-3-11 IS AN AF-FIRMATIVE DEFENSE.*

■ The day after the jury returned its verdict, Clinical Lab's counsel wrote the trial judge requesting to be heard on the applicability of SDCL 21-3-11.[13] Sander asserts this statute is an affirmative defense or an avoidance which is required to be pled in responsive pleadings pursuant to SDCL 15-6-8(c). Sander then concludes Clinical Lab has waived its opportunity to avail itself of that statute's limitation on damage awards because it did not formally assert this statute until after a jury verdict adverse to it was returned. The trial court found the statute was not an affirmative defense and did not have to be pled in responsive pleadings.

SDCL 15-6-8(c) contains an extensive list of affirmative defenses to be pled in responsive pleadings.[14] That list does not include the statute capping medical malpractice damage awards, nor does the language of SDCL 21-3-11 indicate the legislature intended that statute to be an affirmative defense. The statutory list of affirmative defenses concludes with the phrase "any other matter constituting an avoidance or affirmative defense." *Id.* Sander asserts this phrase encompasses SDCL 21-3-11.

We again look to federal court decisions for assistance in interpreting this phrase. *Brasel,* 89 S.D. at 116, 229 N.W.2d at 570; *Wilson,* 83 S.D. at 211, 157 N.W.2d at 21. One purpose behind the federal counterpart to our affirmative defense statutes is to give the opposing party notice. *Blonder–Tongue*

*Lab. v. University of Ill. Found.,* 402 U.S. 313, 350, 91 S.Ct. 1434, 1453, 28 L.Ed.2d 788, 812 (1971). The notice purpose of pleading an affirmative defense has here been served as it is beyond dispute that Sander was made aware several months before trial, and again at trial, that Clinical Lab intended to seek the benefits of SDCL 21-3-11.

Another purpose of pleading an affirmative defense is to give the plaintiff a chance to rebut the asserted defense. *Id.* However, here the question is not whether Sander has had a chance to rebut an application of SDCL 21-3-11, for that chance can hardly be questioned in view of the fact that Sander had ample notice of Clinical Lab's intention. Rather, the question is whether the statute raises any issues of fact which can be rebutted by a plaintiff.

While the enumerated defenses in SDCL 15-6-8(c) may or may not be applicable in any particular case, as determined by the trier of fact, the medical damages cap statute applies in *every* medical malpractice case, though the statute may or may not have an ultimate effect in a particular case. The only questions this statute raises are legal questions and they do not arise until after a verdict has been obtained.

For the foregoing reasons, the trial court did not err when it determined SDCL 21-3-11 is not an affirmative defense.

## C. *WHETHER SDCL 21-3-11 APPLIES TO MULTIPLE CAUSES OF ACTION.*

■ The parties raise the question of whether SDCL 21-3-11 applies separately to each cause of action—personal injury and wrongful death. The trial judge noted he and his law clerk had discussed this issue and he found it significant that the introductory language of the statute reads "in any action" rather than "in any cause of action." The trial court then found the statute did not apply separately to each of Sander's causes of action.

---

**13.** Sander gave notice the same day of a constitutional challenge to this statute.

**14.** The affirmative defenses are "accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration,

fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver and any other matter constituting an avoidance or affirmative defense." SDCL 15-6-8(c).

SDCL 21–3–11 begins with these words: "In any action for damages for personal injury *or* death alleging malpractice ..." (emphasis added). Medical malpractice gives rise to only two types of actions. The first of these is a common law action brought by the injured party, or the party's representative, to recover damages for personal injuries and medical expenses. The only recipient of any of these damages recovered will be the injured party or the estate of the injured party in the event the injured party does not survive the completion of this cause of action. *See Plank v. Heirigs*, 83 S.D. 173, 177, 156 N.W.2d 193, 196 (1968); SDCL 15–4–1 & 2. In that event, the distribution of these damages will then be made according to the laws of testate or intestate succession. Under the facts of this case, this cause of action could only be brought by Kim, or her representative, and any recovery of damages can only go to Kim or her estate. SDCL 21–3–11 clearly intends to cap an award of these damages at $1 million.

The second cause of action which may arise from medical malpractice is a legislatively created wrongful death action. SDCL 21–5–1. The parties entitled to bring this action are listed in SDCL 21–5–5. The apportionment of any wrongful death damages recovery is then made among the statutory beneficiaries "in such manner as shall be fair and equitable[.]" SDCL 21–5–8. Under the facts of this case, Kim's surviving husband and her surviving children could have each brought a separate wrongful death action, at a different time (within the statute of limitations). Each of these individuals would be entitled to his/her own $1 million cap on wrongful death damages from medical malpractice.

The possible plaintiffs in these two causes of action are distinct as are the remedies, the recipients of any damages awarded and the distributions of damage awards from each damages action. *Pexa v. Clark*, 85 S.D. 37, 42, 176 N.W.2d 497, 500 (1970). The legislature used the disjunctive "or" when it enacted SDCL 21–3–11. We read "or" to mean the legislature intended to recognize the differences in the two causes of action and to apply the cap separately to each. We are further persuaded to this interpretation because to do so gives effect to all of the provisions of wrongful death actions, common law personal injury actions, and SDCL 21–3–11, and makes them "harmonious and workable." *Meyerink*, 391 N.W.2d at 184.

In the normal course of events it is likely the trial court would order these multiple actions consolidated, where possible, because of the nature of the overlapping, or identical, proofs required in these actions. However, a consolidation of these actions and parties, whether voluntary or court ordered, does not alter the separate damages cap applicable to each action and each party.

We conclude that SDCL 21–3–11 is properly read to place a cap of $1 million on an injured party's common law personal injury action, and to place a separate $1 million cap on each wrongful death action brought by each statutory beneficiary entitled to bring such an action.

### D. CONSTITUTIONAL CHALLENGES TO SDCL 21–3–11.

We have previously determined SDCL 21–3–11 is not available to Clinical Lab so we need not address the parties' questions regarding the propriety of the trial court's consideration of the constitutional challenges raised by Sander. Further, because we have decided this case on other than constitutional grounds, we are not warranted in addressing the constitutional questions raised regarding SDCL 21–3–11. *Torigian v. Saunders*, 77 S.D. 610, 616, 97 N.W.2d 586, 589–90 (1959); *State v. Devericks*, 77 S.D. 509, 514, 94 N.W.2d 348, 351 (1959).

We are not unmindful of the importance of the constitutional questions to the parties. Nor are we unmindful of their great interest and concern to the people and public policy of this State. It is foreseeable that we shall be faced with these same questions again in the future. The parties' briefing to this Court on the many constitutional issues is excellent, as has been their presentation to this Court on all the issues. Under some circumstances, these considerations may form a sufficient reason to address the constitutional issues. *See Physician's Health Group*, 447 N.W.2d at 515; *Rapid City Jour-*

*nal,* 283 N.W.2d at 565. But we have a factual uncertainty: The jury awarded damages as a lump sum. Consequently, we do not know how the jury actually apportioned the damages, either between the common law cause of action and the statutorily created cause of action, or between the several plaintiffs themselves.[15]

We will not assume as fact that one of these plaintiffs has been adversely affected by SDCL 21-3-11. It is true that Sander's counsel argued the following damages in closing arguments to the jury: that the monetary value of Kim's pain and suffering was $1,000,000, that her economic damages amounted to $439,000, that the monetary loss to each child was $480,000, and that the loss to her husband was $890,000. Nevertheless, we are not warranted in assuming the jury awarded damages to Kim's estate and to her survivors as argued by Sander's counsel, particularly in view of the fact that the total damages awarded by the jury was $69,000 less than the damages argued by counsel. It is an unsound practice to reach constitutional challenges upon assumed facts not in the record, particularly where we have already disposed of the case on other grounds.

In sum, we conclude the trial court made no reversible errors in its conduct of the trial. The trial court's determination that SDCL 21-3-11 is not an affirmative defense is also affirmed. However, we reverse the trial court's determination that SDCL 21-3-11 does not apply separately to each cause of action. We reverse the trial court's determination that Clinical Lab could avail itself of the limitation on award of damages found at SDCL 21-3-11 and we reverse its judgment reflecting a reduced award of damages of $1

million. The trial court is instructed to enter judgment for Sander in the amount of $3.7 million.

WUEST, HENDERSON and AMUNDSON, JJ., concur.

SABERS, J., concurs in result.

SABERS, Justice (concurring in result).

I write specially to assert a better basis for affirming this jury verdict.

SDCL 21-3-11 violates the doctrine of separation of powers. *See* S.D. Const. art. II. "The powers of the government of the state are divided into three distinct departments, the legislative, executive and judicial; and the powers and duties of each are prescribed by this Constitution." *Id.* The function of the legislature is to enact legislation for the benefit of the people of the State of South Dakota in accordance with the Constitution. The function of the judiciary is to make factual determinations and interpret the laws of the United States and the State of South Dakota in accordance with the Constitution.[1] Neither branch of government may intrude upon the constitutional functions of the other. "As the legislature cannot set aside the construction of the law already applied by the courts to actual cases, neither can it compel the courts for the future to adopt a particular construction of a law which the legislature permits to remain in force." Thomas M. Cooley, A Treatise on the Constitutional Limitations 191 (8th ed. 1927). *See generally, Dunker v. Brown County Bd. of Educ.,* 80 S.D. 193, 121 N.W.2d 10 (S.D.1963) (the constitutional separation of powers cannot be done away with by legislative action).

---

**15.** Prior to submission of the case to the jury, and out of hearing of the jury, instructions were proposed which would have required the jury to determine the amount of damages to which each beneficiary in the wrongful death action was entitled. Ultimately, it was decided not to give such an instruction and the jury returned an award of damages as a lump sum.

**1.** "Where, however, the facts out of which a moral or legal obligation is claimed to arise are disputed, the contention falls within the province of the courts, under the distribution of governmental powers prescribed by our constitution."

*Board of Educ. v. Ohio ex rel. Lindsay,* 51 Ohio St. 531, 38 N.E. 614, 618 (Ohio 1894) (citation omitted).

"[T]he Legislature may not declare the weight to be given to evidence or what evidence shall be conclusive proof of an issue of fact[.] ... [W]hether evidence is of probative value is a legal question, and the Legislature cannot impair judicial analysis and resolution of such questions."

*Nebraska v. Burling,* 224 Neb. 725, 400 N.W.2d 872, 876 (1987) (citations omitted).

SDCL 21–3–11 arbitrarily and without a hearing imposes a limitation of one million dollars on *all* damages in *all* medical malpractice actions. It does so without provisions for determining the extent of the injuries or resulting illness, or whether these injuries or illness resulted in death. It purports to cover even those cases where the medical costs occasioned by the malpractice alone exceed one million dollars. In other words, the damages recovered in these cases would be payable to the wrongdoers, not the victims. It does so in *all* cases even where, as here, a judicial determination of damages of 3.7 million dollars resulted from an adversarial hearing after notice. Not only is SDCL 21–3–11 legislatively arbitrary, it also clearly intrudes upon the constitutional function of the judiciary, which includes the jury. Therefore, it is unconstitutional in its application to these facts.

Under SDCL 21–3–11, "practitioners of the healing arts" would be responsible for only a portion of the injuries caused by their negligence when the damages exceed one million dollars. The South Dakota Constitution requires that the courts remain open and every man for an injury done him "shall have remedy by due course of law, and right and justice, administered without denial or delay." S.D. Const. art. VI, § 20. Art. VI, § 6 of the South Dakota Constitution provides in part: "The right of trial by jury shall remain inviolate and shall extend to all cases at law *without regard to the amount in controversy* [.]" S.D. Const. art. VI, § 6 (emphasis add-

ed). The "open courts" and "jury trial" provisions of the South Dakota Constitution apply to *all* damages, not just partial damages. This arbitrary limitation on damages is prevented not only by the "open courts" provision [2] and the constitutional right to jury trial,[3] but by other substantial constitutional provisions.[4] These constitutional provisions do not permit remedies to be arbitrarily limited in advance without a hearing. Therefore, this enactment, when applied to these facts, violates the South Dakota Constitution.

South Dakota has codified the law of negligence in SDCL 20–9–1 which provides:

> Every person is responsible for injury to the person, property, or rights of another caused by his willful acts or caused by his want of ordinary care or skill, subject in the latter cases to the defense of contributory negligence.

"SDCL 20–9–1 is a simple codification of the common law of negligence. In essence, then, the South Dakota Constitution and existing statutory law provide that an injured person has a right to a remedy against a wrongdoer." *Baatz v. Arrow Bar*, 426 N.W.2d 298, 304 (S.D.1988) (citing *Zacher v. Budd Co.*, 396 N.W.2d 122 (S.D.1986); *Oien v. City of Sioux Falls*, 393 N.W.2d 286 (S.D.1986); *Daugaard v. Baltic Co-op Bldg. Supply Ass'n*, 349 N.W.2d 419 (S.D.1984)). Therefore, under SDCL 20–9–1, and subsequent case law, Clinical Lab is responsible for injuries caused by its want of ordinary care or skill.

---

**2.** Several courts have found damage cap statutes similar to SDCL 21–3–11 unconstitutional because they violate the "open courts" provision. *See e.g., Smith v. Dept. of Ins.*, 507 So.2d 1080 (Fla.1987); *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 757 P.2d 251 (1988); *Lucas v. United States*, 757 S.W.2d 687 (Tex. 1988). Other courts have rejected the open courts/right to remedy challenge. *See e.g., Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898 (Mo.1992) (en banc); *Johnson v. St. Vincent Hospital, Inc.*, 273 Ind. 374, 404 N.E.2d 585 (1980).

**3.** Several courts have held similar damage cap statutes unconstitutional on the ground that they violate the right to a jury trial. *See Moore v. Mobile Infirmary Ass'n*, 592 So.2d 156 (Ala. 1991); *Smith*, 507 So.2d 1080; *Kansas*, 757 P.2d 251.

**4.** S.D. Const. art. VI provides in part:

§ 1. *Inherent rights.* All men have certain inherent rights including enjoying and defending life and liberty, acquiring and protecting property and the pursuit of happiness.

§ 2. *Due Process.* No person shall be deprived of life, liberty, or property without due process of law.

§ 12. *Privilege or immunity laws.* No law granting an irrevocable privilege, franchise or immunity shall be passed.

§ 18. *Equal privileges or immunities.* "No law shall be passed granting to any citizen, class of citizens or corporation, privileges or immunities which upon the same terms shall not equally belong to all citizens or corporations."

*Gasper v. Freidel*, 450 N.W.2d 226, 235 n. 3 (S.D.1990) (Sabers, J., concurring specially).

"The legislature can impose reasonable restrictions upon available remedies and even upon these rights in accordance with the constitution, as long as they do not violate the constitution; but they cannot destroy these rights in violation of the constitution." *Id.* Placing a limitation on malpractice damage awards is not, however, a "reasonable restriction in accordance with the constitution." Although "the legislature can abrogate the rights that flow from legislative acts and statutes," *id.* at 302, this requires the repealing of "the statute from which the rights flow." *Id.* The legislature did not repeal SDCL 20-9-1, but rather enacted a separate statute, SDCL 21-3-11, in an attempt to limit the rights of malpractice victims such as Kim. As stated earlier, the legislature cannot "compel the courts for the future to adopt a particular construction of a law which the legislature permits to remain in force." Cooley, *Constitutional Limitations* 191. Therefore, this legislative attempt to limit the rights of malpractice victims against wrongdoers, without eliminating SDCL 20-9-1,[5] is ineffective. *Baatz,* 426 N.W.2d at 303.

The task of determining damages belongs to the courts, not the legislature. *See generally, Id.* ("[T]he task of determining proximate cause (and civil liability for wrongdoing) belongs to the courts, not the legislature."). "The judicial power is the power to hear and determine those matters which affect the life, liberty, or property of the citizens of the State." Cooley, *Constitutional Limitations* 184 n. 3 (citation omitted).

---

**5.** Because "SDCL 20-9-1 is a simple codification of the common law of negligence," it could be argued that the legislature is without power to

abrogate the rights that flow from it. *Cf. Baatz,* 426 N.W.2d at 302.